## THE KIMBALL.

1. Stipulations in a charter-party requiring the delivery of the cargo within
reach of the ship's tackle, and providing that the balance of the charter-
money remaining unpaid on the termination of the homeward voyage
shall be "payable, one-half in five, and one-half in ten days after dis-
charge" of the cargo, are not inconsistent with the right of the owner
to retain the cargo for the preservation of his lien.
2. A clause in a charter-party, by which the owner binds the vessel, and
the charterers bind the cargo, for the performance of their respective
covenants, is sufficient to repel doubt arising upon the construction of
other stipulations not plainly controlling them, as to whether the lien
for freight was intended to be waived by the parties.
3. By the general commercial law a promissory note does not extinguish
the debt for which it is given, unless such be the express agreement of
the parties; it only operates to extend until its maturity the period for
the payment of the debt.  The creditor may return the note when dis-
honored, and proceed upon the original debt.  The acceptance of the
note is considered as accompanied with the condition of its payment.
And although in Massachusetts the rule is different, and the presump-
tion of law there is that a promissory note extinguishes the debt for
which it is given, yet there the presumption may be repelled by evidence
that such was not the intention of the parties; and this evidence may
arise from the general nature of the transaction, as well as from direct
testimony to the fact.
4. Upon this ground it is not to be presumed that the owner of a ship, having
a lien upon a cargo for the payment of the freight, intended to waive
his lien by taking the notes of the charterers drawn so as to be payable
at the time of the expected arrival of the ship in port.  The notes being
unpaid, he may return them and enforce his lien.

THE owner of the Kimball chartered her, in July, 1856,
to a Boston firm, for a round voyage from New York to
Melbourne, Calcutta, and Boston.  The charter-party, in
most of its provisions, was in the usual form.  A portion of
the charter-money was to be paid, and was paid, before or

during the voyage; "balance," the instrument proceeded, "payable, one-half in five and one-half in ten days, *after discharge of homeward cargo.*"

The charter-party contained, also, a clause that the cargo should "be received and *delivered within reach of the ship's tackles at the ports of lading and discharging,*" and concluded with the not unusual provision, that for the performance of its covenants the parties bound themselves—the party of the first part, the vessel, her freight, tackle, and appurtenances; the party of the second, the freight and merchandise to be laden aboard—each to the other, in the penal sum of $40,000.

While the ship was yet at sea, the charterers, at the owner's request, gave him their notes for $10,000. They were drawn so as to be payable near the time when it was expected that the ship would arrive; and it appeared by the testimony of the broker who had been concerned in the matter, that they were given for the accommodation of the owner, and were to be held over or renewed in case they fell due before the ship reached home. The owner, in a receipt for the notes, stated that he had received them. "*on account of the charter,*" and that it was "understood that this amount was to be insured by the charterers and charged to the owners of the ship." The owner used the notes, and obtained money on one of them at a bank where he had an account. The charterers effected insurance on the $10,000, in pursuance of the agreement. The vessel arrived about five weeks before the notes by their terms fell due.

Shortly before the vessel arrived home, and before the notes fell due, the charterers failed. The owner immediately tendered them back their notes, but they would not receive them.

By the terms of the charter-party the cargo was to be deliverable to the consignees, "they paying freight as per charter-party," and after the arrival of the vessel, the owners, asserting a lien on the cargo for the unpaid money, and refusing to credit as payment on account, the notes for $10,000, filed a libel in the District Court for Massachusetts to enforce the lien. This libel was filed on the 18th March, 1858; the

notes, which were produced and tendered in court, having fallen due on the 3d preceding. On appeal to this court from the Circuit Court, where the matter went on appeal from the District Court, two questions arose.

1. Whether the ordinary lien of the ship-owner was displaced by anything in the charter-party?

2. Whether the notes of the charterers were to be considered as payment?

The Circuit Court, reversing the District Court, had held negatively on both points.

*Mr. Thaxter for the owners of the cargo, appellants:*

I. In *Raymond* v. *Tyson*[*] it is said, by Wayne, J., that the lien of the ship-owner for freight or hire " may be considered as having been waived without express words to that effect, if there are stipulations in the charter-party inconsistent with the exercise of the lien, or where it can be fairly inferred that the owner meant to trust to the personal responsibility of the charterer."

Neither will the subsequent insolvency of the charterer restore a lien once waived or lost. In *Alsager* v. *The St. Katherine Dock Co.*,[†] a case like this, where insolvency had given rise to the litigation, Chief Baron Pollock said, " Did the owner intend to abandon his lien and receive payment of the freight two months after the inward report, or did he mean to retain his lien, and keep his right to refuse delivery of the cargo until the freight was paid? If the ship-owner could not have refused to deliver the goods *provided the charterer had continued solvent*, he cannot maintain that claim now."

Now, we say that the stipulation in the charter, that the cargo should be *delivered within reach of the ship's taekle*, is inconsistent with the right of retaining it to enforce the lien set up; which retention involves the unloading and storing of the cargo.

---

[*] 17 Howard, 59; see also Dimech v. Corlett, 12 Mocre, Privy Council, 199.

[†] 14 Meeson & Welsby, 794.

Independently of this stipulation, the credit given for the payment of the balance of the charter-money after discharge at the home port, is inconsistent with the existence of a lien and the discharge of the ship and the delivery of the cargo according to the usual and customary manner. This clause giving this credit was inserted *for the benefit of the charterers.* It is not merely a formal part of the charter, but is a living, active provision, having reference to the contract intended to be made, and such a construction must be given to the charter as shall make this clause operate as a beneficial credit.

Again: we think that by the true construction of this charter, the parties intended that the cargo should be discharged and delivered in the usual and customary manner. If, then, the retention of the cargo for the purpose of retaining a lien thereon until the expiration of the credit, will prevent the discharge and delivery of the cargo in the usual and customary way, such retention cannot be authorized.* The usual and customary course is to give notice to the consignee or owner of the goods when his goods are to be discharged, and then to discharge them upon the wharf, when the liability of the carrier as such ceases, and the goods are at the risk of the owner.† But to give full effect to the credit specified, and preserve the lien, the master must have discharged his cargo and *stored* it, no matter how many different sub-freighters there may have been.

The printed clause at the end of the charter-party,—a clause found in nearly all charter-parties—which agrees to bind the freight and merchandise to be laden on board to a performance of the contract,—has no application to this part of the contract. As was said by Baron Bramwell, in *Foster* v. *Colby,* " The true meaning of that clause is, that the owner is to have a lien so far as a lien is possible." Baron Watson, in the same case, said, in reply to the argument that this clause gave an absolute lien on the cargo, " It is impos-

---

* Foster v. Colby, 3 Hurlstone & Norman, 705; Alsager v. St. Katherine Dock Co.

† Richardson v. Goddard, 23 Howard, 28; Houlden v. The General Steam Nav. Co., 3 Foster & Finlason, 170; Black v. Rose, 10 Jurist, N. S., 1009

Argument against the lien.

sible there can be a lien for money not due." And again, " If the vessel is discharged abroad, the freight is 'to be paid in cash on right delivery of the cargo.' The clause giving a lien would attach in that case. The true meaning is, that wherever there can be a lien the ship-owner is to have it," &c. So in this case, the clause giving a lien would attach to the outward freight and to demurrage.

The cases of *The Volunteer*,* and of *Certain Logs of Mahogany*,†—circuit rulings of the late Story, J.,—might be supposed to militate with our view. But they do not. The former is distinguishable from this. There the freight was payable "within ten days after the schooner's return to Boston." It appeared by the duty-collection list that the time for entering at the custom-house was such that Story, J., found "that an *unlivery* could be rightfully postponed beyond the ten days after the return of the ship, when by the terms of the charter-party the freight would become due."

The case of *Certain Logs of Mahogany* is peculiar, and can well stand upon the fact that it was agreed that the cargo should be subject to the lien for freight, notwithstanding the provision making the freight payable in five days after her discharge.

II. *As respects the notes.* We suppose it to be well settled where an advance is made upon freight or charter-money, in money or notes, with an agreement that the advance is to be insured for or by the shipper or charterer, that such advance shall be treated as a pre-payment of freight, at the risk of the shipper, which, to the extent of it, discharges the lien.‡

And whatever may be the doctrine of particular States as to the effect of taking a promissory note on the original debt, yet it is equally true that it will be treated by all courts, everywhere, as payment, where it appears that the parties so intended it: as we think it was intended here.

---

* 1 Sumner, 570.                    † 2 Id. 602.

‡ Hicks *v.* Shield, 7 Ellis & Blackburne, 633; Jackson *v.* Isaacs, 3 Hurlstone & Norman, 405; Trayes *v.* Worms, 12 Law Times, N. S., 547; Tolmaco *v.* Simpson, 13 Id. 160.

Whether these notes are to be considered as payment or not, it is well settled that no action could be brought on the original debt until their maturity, and the taking of them was tantamount to an agreement on the part of the owner to give the charterers the credit expressed on their face for that amount of the charter-money.* The notes were not due when the ship arrived and the cargo became deliverable; nor till five weeks afterwards.

*Mr. B. R. Curtis, who argued the case fully on principle and authorities, contra.*

Mr. Justice FIELD delivered the opinion of the court:

Two questions are presented for determination in this case: *first*, whether the lien of the owner of the ship upon the cargo for the freight was waived or displaced by the stipulations of the charter-party; and, *second*, whether the notes given for a portion of the charter-money constituted payment of the same.

It is admitted that the lien of the owner of a ship upon its cargo for freight is favored by the courts; and will not be displaced, so long as the ship-owner retains possession of the cargo, except by express contract, or by stipulations in the charter-party inconsistent with its exercise. The position of the appellants is, that there are such inconsistent stipulations in the charter-party in this case; and two clauses are mentioned in support of this position,—the clause requiring the delivery of the cargo within reach of the ship's tackle, and the clause providing that the balance of the charter-money remaining unpaid on the termination of the homeward voyage shall be "payable one-half in five and one-half in ten days after discharge" of the cargo.

There is nothing in these provisions inconsistent with the right of the owner to retain the cargo for the preservation of his lien. The first clause only designates the place where the delivery must be had, which, in this case, is the wharf at which the ship may be lying. The second clause only

---

* Belshaw *v.* Bush, 11 Common Bench, 191; Price *v.* Price, 16 Meeson & Welsby, 239; Wheeler *v.* Schroeder, 4 Rhode Island, 383.

prescribes the period in which payment must be made after the discharge of the cargo. The discharge mentioned does not import a delivery of the cargo; it only imports its unlading from the ship. Such is the obvious meaning of the term, and so it has been judicially held.* The clause was intended for the benefit of the charterers. It gives them ample time to examine the goods, and ascertain their condition, and decide whether they will take them and pay the freight, or decline to receive them. They can waive it and take the cargo short of the period designated, if it be ready for delivery.

The cases cited by the appellants do not support their position. In *Foster* v. *Colby*,† the charter-party provided that the remainder due for freight should be paid " in cash two months from the vessel's report inwards at London or Liverpool, and after right delivery of the cargo." The stipulation for the payment *after* the delivery of the cargo was inconsistent with the existence of a lien. In *Alsager* v. *St. Katherine Dock Co.*,‡ the charter-party contained two clauses, one providing for the delivery of the cargo on payment of the freight at a stipulated price, and the other providing for the payment of the freight " two months after the vessel's inward report at the custom-house." The court reconciled these clauses by annexing to the first the qualification as to the time of payment contained in the second, and read them together as requiring payment two months after delivery. The payment being thus considered to be irrespective of the delivery, it followed that no lien existed.

There is no doubt that a credit for the freight may be given for so great a period as to justify, in the absence of any provision for the delivery of the cargo, the inference that the ship-owner intended to waive his right to a lien, and to look solely to the personal responsibility of the charterers. It is sufficient, however, that there is no such credit given in the present case. Here the period allowed is only a reasonable one for examining the condition of the cargo.

---

\* Certain Logs of Mahogany, 2 Sumner, 589.

† 3 Hurlstone & Norman, 705.          ‡ 14 Meeson & Welsby, 794.

But if there were any doubt as to the construction of the provision for the credit, it is dispelled by the concluding clause of the charter-party. By that clause the owner binds the vessel, and the charterers bind the cargo for the performance of all their respective covenants, of which the payment of the charter-money is one. Though the law, in the absence of any stipulations on the subject, ordinarily implies this mutual security in every contract of affreightment, yet its distinct statement in the charter-party shows that the attention of the parties was called to it, and is an important circumstance to be considered in the construction of other stipulations of the instrument respecting the payment of the freight.

In the case of the *Schooner Volunteer*,\* Mr. Justice Story had occasion to consider the effect of a similar clause in a charter-party. In that case the charterers had agreed to pay for the freight "within ten days after the return of the vessel to Boston," or in case of loss after she was last heard from; and the question was, whether the allowance of the ten days for the payment of the freight amounted to a waiver of the lien? The learned judge held that it did not, and in this connection considered the effect of the clause named. After an extended examination of the authorities, he came to the conclusion that it contained an express contract for a lien; and if it did not, still that it contained enough to repel any notion that the delivery of the goods should precede the payment of the freight, or that the lien of the maritime law for freight was intended to be waived by the parties.

The second question for determination is, whether the notes given for a portion of the charter-money constituted payment of the same?

The notes were given before the termination of the voyage, and, consequently, before the balance of the charter-money became due. Treating them as an advance of a portion of the freight, they could be recovered back, or their amount, if paid, if the vessel did not arrive. Freight being

\* 1 Sumner, 551.

the compensation for the carriage of goods, if paid in advance, is in all cases, unless there is a special agreement to the contrary, to be refunded, if from any cause not attributable to the shipper the goods be not carried.* And there was no such special agreement in this case. The notes were drawn so as to mature near the time of the anticipated arrival of the ship, and according to the statement of the broker who made the arrangement, they were given for the accommodation of the ship-owner, and were to be held over or renewed in case they fell due before the arrival. This statement is consistent with the nature of the transaction, and is sufficient to repel any presumption, under the law of Massachusetts, that the notes were taken in discharge or payment of the claim for the charter-money. The presumption which prevails in that State, that a promissory note extinguishes the debt or claim for which it is given, may be repelled by any circumstances showing that such was not the intention of the parties.

By the general commercial law, as well of England as of the United States, a promissory note does not discharge the debt for which it is given unless such be the express agreement of the parties; it only operates to extend until its maturity the period for the payment of the debt. The creditor may return the note when dishonored, and proceed upon the original debt. The acceptance of the note is considered as accompanied with the condition of its payment. Thus it was said, as long ago as the time of Lord Holt, that " a bill shall never go in discharge of a precedent debt, except it be part of the contract that it should be so."† Such has been the rule in England ever since; and the same rule prevails, with few exceptions, in the United States. The doctrine proceeds upon the obvious ground, that nothing can be justly considered as payment in fact, but that which is in truth such, unless something else is expressly agreed to be received in its place. That a mere promise to

---

* Watson *v.* Duykinck, 8 Johnson, 385; Griggs *v.* Austin, 8 Pickering, 20; Phelps *v.* Williamson, 5 Sandford, 598.

† Clark *v.* Mundel, 1 Salkeld, 124.

pay cannot of itself be regarded as an effective payment is manifest.

The rule in Massachusetts is an exception to the general law; but even there, as we have said, the presumption that the note was given in satisfaction of the debt may be repelled and controlled by evidence that such was not the intention of the parties, and this evidence may arise from the general nature of the transaction, as well as from direct testimony to the fact. Thus, in *Butts* v. *Dean*,\* where a note was given for a debt secured by the bond of a third person, it was held that it was not to be presumed that the creditor intended to relinquish his security, and, therefore, the note was not to be deemed payment for the original debt. And following this and other like authorities of that State, Mr. Justice Sprague, of the United States District Court, held that a lien for materials furnished a vessel built in Massachusetts, a lien given in such a case, by a law of that State, was not displaced or impaired by the creditors taking the notes of the debtor.†

And on like grounds, we think that any presumption of a discharge of the claim of a ship-owner, and of his lien upon the cargo in this case, by his taking the notes of the charterers, is repelled and overthrown.

DECREE AFFIRMED.

---

\* 2 Metcalf, 76.          † Page *v.* Hubbard, Sprague, 338.