## The Queen of St. Johns.[1]

### (*Circuit Court, N. D. Florida.* December 13, 1886.)

1. MARITIME LAW—WAIVER OF LIEN.
    Taking a note and giving time will not necessarily release the maritime lien resulting from supplies furnished a vessel.
2. SAME—LIEN OF OWNER.
    One who is a manager or part owner of a vessel should not be allowed a lien upon her to the prejudice of outside lien-holders.
3. SAME—SUPPLIES IN HOME PORT.
    It is well settled that advances and supplies made to a vessel in her home port are presumed to be made on the credit of the owners, and no maritime lien results.

Appeal in Admiralty.

In this cause, submitted on the transcript and evidence, the court finds the following facts:

(1) The Queen of St. Johns was owned by the Favorite Navigation Company, a corporation created under the laws of Kentucky, at Covington, Kentucky, in November, 1884.

(2) That the original stock of the said company was divided into 500 shares, and was taken November 21, 1884, as follows: *Certificates of Stock:* (1) 100 shares, $100 each, to W. R. Kemper; (2) 100 shares, $100 each, to Sarah Morton; (3) 50 shares, $100 each, Henry Morton; (4) 50 shares, $100 each, Henry Morton; (5) 200 shares, $100 each, Frank M. Morton. Total, 500 shares, $50,000.

(3) That next day Henry Morton, the president of the corporation, reported that the bill of sale conveying the steamer to the corporation had been left for record at the custom house in Cincinnati, where she was enrolled. There was no subsequent enrollment.

(4) That the articles of incorporation provided that the capital stock of the company was "to be paid in in cash, on or before the twelfth day of December, 1884," (article 5;) and that the said corporation shall be managed by a president and two directors, who shall be chosen by ballot from the stockholders

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

after the first election, (article 7;) and the by-laws, (section 7) provided that either the president and one director, or two directors, shall constitute a quorum of the board of directors and be entitled to act.

(5) Article 2 of the articles of incorporation provided that the business of said corporation shall be building, chartering, buying, selling, conducting, and running of a steam-boat, or other vessels or water craft, and transportation of freight and passengers, and the buying, selling, and disposing of such vessels, and other real and personal property, within the United States, in whole or part as the corporation may deem proper. Section 4 of the by-laws further provided that the secretary shall keep in the minute-book a full account of all proceedings, which shall be subject to the inspection of any stockholder; and section 3, that called meetings may be held at any time and place designated by the president.

(6) Article 11 of the act of incorporation provided that the private property of the stockholders shall be exempt from liability of the debts of the corporation; and article 13 provided that any stockholder may at any time withdraw from the incorporation by selling his stock to another party for any amount, but he shall first pay his share of the debts of the corporation at that time, or sell the same liable therefor, and no such transfer of stock shall be made until the officers of the corporation have their option of taking said stock at the same price.

(7) That, as appears by the minutes of the company, Henry Morton was chosen president, and W. R. Kemper, secretary, upon the organization of the said corporation, about November 3, 1884, and both were elected November 6, 1884; and both continued holding said offices respectively from such election down to the time the steamer Queen of St. Johns was libeled in this cause; and on the same date, November 6, 1884, Frank M. Morton and W. R. Kemper were elected directors and have so continued; that the said president, Henry Morton, was and is the husband of Sarah Morton, who owned and continued to own and still owns one-fifth of the stock; and Henry Morton is the father of Director Frank M. Morton, who took originally two-fifths of the stock of said company; and the said Henry Morton took originally one-fifth of said stock.

(8) That, so far as the minutes of said company produced in this case show, it does not appear that said stock so subscribed was paid up, either in whole or in part, but it otherwise appears in the case that the steam-boat Queen of St. Johns was then nearly built at a cost of about $42,900, and was owned by Frank M. Morton, three-fifths, Sarah M. Morton, one-fifth, and W. R. Kemper, one-fifth; that she was sold to the Favorite Navigation Company at a price not appearing, and thereupon Frank M. Morton being desirous that his father, Henry Morton, should be president, W. R. Kemper secretary, and himself treasurer, Henry Morton subscribed for one-fifth of the stock, for which Frank Morton paid; the whole case showing no payment for stock subscribed by or for any subscriber, except such payment as was made by the transfer of the Queen of St. Johns at an unknown price to the Favorite Navigation Company.

(9) That certificates for 100 shares of stock of the Favorite Navigation Company were issued November 21, 1884, to Henry Morton, signed by himself as president, and receipted for by him; that these certificates were marked canceled December 16, 1884, and on the same day new certificates for 100 shares were issued to Frank M. Morton; that from November 1 to November 19, 1885, 300 shares of the said capital stock were through issue of new certificates transferred by Frank M. Morton to Henry Morton, the latter receipting therefor. These 300 shares were transferred without consideration and for the purpose of selling the whole or part, but no sale was effected, and a retransfer was made by Henry Morton to Frank M. Morton by delivery and marking on stub in stock-book "Canceled," though no new certificates were

issued or other transfer made on the books of the company. It further appears that in February, 1886, Henry Morton acquired from W. R. Kemper 100 shares of the stock of the said company, by transfer in the stock-book and new issue of certificates, of date February 16, 1886, receipted for by Henry Morton, February 26, 1886.

(10) That after the transfer of said steam-boat to the Favorite Navigation Company and up to December 16, 1884, the said boat received additional machinery, outfitting, work, and labor, looking to her preparation to run in the St. Johns river, Florida, which machinery, outfitting, etc., were paid for with sums advanced and obligations assumed by Frank Morton, Henry Morton, and W. R. Kemper, but for what amount does not appear; that from and after December 16, 1884, when the boat left Cincinnati on her trip to St. Johns river, and up to the time she was libeled, during which time said boat had a run of ill luck and delays, constantly needing advances and frequently needing repairs and once requiring radical changes, the expenses of said boat were met by moneys advanced and obligations assumed and debts contracted by said Frank Morton, Henry Morton, and W. R. Kemper, generally acting as president and directors of the Favorite Navigation Company, Frank Morton and Kemper being also respectively master and purser of the boat; that subsequent to December 16, 1884, and while the said steamer was away from her home port, Henry Morton, at the domicile of the owner and the home port of the steamer, made advances to relieve the needs of the said steamer in moneys and supplies to the amount, principal and interest, of $11,266.41, for which he from time to time took notes, payable in four months from date, signed "Steamer Queen of St. Johns, per W. R. Kemper, Purser, Frank M. Morton," except for one amount, $1,880.97, January 1, 1886, he took a note payable on demand for funds used in construction at 10 per cent. interest, signed "Steamer Queen of St. Johns & Owners, per W. R. Kemper, Purser, Frank M. Morton, Master," and except for one amount of $326.98, for which a note was given July 21, 1885, to McIlvain & Spergel, signed "Str. Queen of St. Johns & Owners, Favorite Navigation Company, by Frank M. Morton, Treasurer and Master," which note was indorsed by Henry Morton and by him paid at maturity; that subsequent to December 16, 1884, both Frank M. Morton and W. R. Kemper made advances to relieve the needs of said steamer in large amounts, the latter taking notes for his advances, signed by Henry Morton, president Favorite Navigation Company, and Frank M. Morton, master; that nearly all of the advances made by said Henry Morton, Frank M. Morton, and W. R. Kemper, after December 16, 1884, were made after the said steamer had left Cincinnati, and to meet the necessities of said steamer, and were made individually by the respective parties, and constitute debts of the Favorite Navigation Company, as well as of the steamer Queen of St. Johns; that Henry Morton, during the whole period covered by the supplies which he advanced to said steamer, and which he claims to have created a maritime lien on said steam-boat, was the president of the corporation which owned it, and constituted, with his son, who was the master of the boat during this period, and with Kemper, the secretary of the organization, and who was also the purser of the steamer, the board of directors of the corporation, vested with the powers hereinbefore mentioned.

(11) That shortly after the Queen of the St. Johns' arrival upon the waters of the St. Johns, and while being in the port of Jacksonville, Florida, the respondents in this case other than John G. Christopher furnished to the said steamer the supplies as set up in their several libels; that the said supplies were necessary, and that the master had no other means in the emergency thus put upon him than to purchase supplies from the said respondents, as shown in their several accounts, and that they were purchased on the credit of the steamer.

(12) That while said steamer was in said port of Jacksonville the respondent, John G. Christopher, also furnished supplies and made advances of which the steamer stood in need, amounting to the sum of $11,422.69; that as to a large part of these advances, amounting to the sum of $10,306, consisting of money which was applied to paying the arrears of seamen's wages and purchasing machinery for the boat, the said Christopher took notes on time secured by mortgages of the said steam-boat, which mortgages were executed to him by the master and purser of the steamer, which, however, were never recorded, except in the clerk's office, Duval county, Florida; that the said Henry Morton, the president, did not join in the execution of the mortgages, but knew of their execution, and disbursed a part of their proceeds, in purchasing machinery for the boat.

(13) That the following named parties made advances to the steamer Queen of St. Johns, for which they filed libels in the district court, and for which decrees were made in their favor in the following amounts, respectively, to-wit: The Alabama Coal & Coke Company, $111.17; Henry Bryant, $53.19; J. S. Wright, $6.50; McCan, Given & Smith, $6.80; Alexander B. Stevens, $15; A. P. Taft, $56; J. E. Merrill & Bro., $102.28; Buchanan & Dalaporte, $23; Gillen & Haywood, $13.20; W. R. Lombeck, $546; W. R. Kemper, $1,456; H. R. Duval, $100,—which amounts were decreed by said district court to be paid out of the proceeds of the sale of the steamer Queen of St. Johns now in the registry of this court, and which decrees were not appealed from, and the amounts due are not disputed in this court.

(14) That there is due to the following named libelants for advances to the steamer Queen of St. Johns the following amounts, respectively, to-wit: E. C. Pickett, $144.37; R. B. Hilliard, $74.18; Wightman & Christopher, $781.79; Drew, Hazeltine & Livingston, $197.46; Geo. F. Drew & Co., $976.69; Henry Clark, $292.70; F. E. Smith, $104.28; John G. Christopher, $1,116.69,—which amounts are debts of the Favorite Navigation Company, owners, and constitute a maritime lien of the proceeds of the steamer Queen of St. Johns now in the registry of the court.

(15) That the steamer Queen of St. Johns was sold by the United States marshal, after monition and upon default, for the sum of $12,000, which sum, less certain payments to seamen by consent and the costs of the district court, is now in the registry of this court, and amounts to the sum of $9,952.85.

And the court finds as conclusions of law:

(1) That the decrees of the district court, not appealed from as set forth in the thirteenth finding of facts, should be paid from the funds in the registry of the court.

(2) That the maritime liens declared and found in fourteenth finding of facts should be paid from the funds in the registry of the court.

(3) That the remaining funds in the registry of the court, after paying the costs of the district court and the marshal's costs, should be paid to John G. Christopher, libelant herein, on account of his claim for advances made and moneys loaned to the steamer Queen of St. Johns.

(4) That the costs of this court on appeal should be paid by Henry Morton

*Horace Bisbee,* for libelant, Henry Morton.

*A. W. Cockerill & Son,* for libelant, John G. Christopher.

PARDEE, J. In explanation of the conclusions of law it is proper to say:

1. *As to the claim of John G. Christopher.* There is no doubt that the advances made by Christopher were to a vessel away from her home port in necessitous circumstances. They were applied to the use of the

vessel, and were made on the credit of the vessel. Had no time notes and mortgages been taken, there would be no question that a maritime lien resulted for these advances and supplies. It has been frequently decided that taking a note and giving time will not necessarily release the maritime lien resulting from supplies furnished a vessel. See *The St. Lawrence*, 1 Black, 522; *The Kimball*, 3 Wall. 37; *The Bird of Paradise*, 5 Wall. 545; *The Alabama*, 22 Fed. Rep. 449; *The Gen. Meade*, 20 Fed. Rep. 923. The mortgages taken by Mr. Christopher were executed by the master and purser, and are of doubtful validity; but, whether valid or not, it is difficult to see why taking additional security by way of mortgage on the vessel should be presumed of itself to be a waiver of the lien given by the maritime law. In the findings made it is not denied that Christopher has a maritime lien for his advances, but it is held that such lien under the equities of this case ought to be postponed in favor of those having as security only maritime liens.

2. *As to Henry Morton's claims.* He was the president of the incorporated company owning the vessel, and as such he was one of her managers, and actively participated in the management. As he was president and so acted, he is under the charter estopped from denying that he is, and was during the term of his presidency, a shareholder in the company, so that it is immaterial to inquire whether at certain specified periods he was a shareholder or not. He is now, and was when the vessel was libeled, a shareholder, and as such shareholder he was a part owner in reality, if not technically. Neither as manager nor as part owner should he have a lien to the prejudice of outside lienholders. Besides as a shareholder under the charter his shares (to the extent they are not paid up at least) are charged with the debts of the company. The record does not show that the shares now held by him are paid up, but the evidence rather negatives such full payment. Again, Henry Morton did not make advances in a foreign port, although the vessel to which the advances were made was in a foreign port. He himself made all his advances while he was at the home port and was managing for the owners. It is well settled that advances and supplies made to a vessel in her home port are presumed to be made on the credit of the owners, and no maritime lien results. The record of this case shows that Frank Morton and W. R. Kemper have equally good claims as Henry Morton, and it the pretensions of Henry Morton to a maritime lien on the steamer Queen of St. Johns are well founded, then that vessel, worth about $12,000, came into the admiralty court burdened with secret liens in favor of the president and directors of the Favorite Navigation Company, owner, to the amount of over $20,000, and yet these three parties were the managers of the vessel, and the practical owners of four-fifths of her. If such liens were to be allowed in a court of admiralty, it would open the door to fraud and collusion to such an extent that no safety would exist for any *bona fide* furnisher of supplies to a needy vessel in a foreign port.