BURN LINE, Limited, v. UNITED STATES & AUSTRALASIA S. S. CO.

(District Court, S. D. New York. January 15, 1907.)

1. SHIPPING—CHARTER PARTY—PREPAID FREIGHT.
   The general rule that freight prepaid, but which is not earned by delivery of the goods, must be refunded, does not apply as between owner and charterer, where by reference in the charter party the bills of lading are incorporated therein, and they contain a provision that freight prepaid shall be considered as earned, ship lost or not lost.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 514.]

2. SAME—LIABILITY OF CHARTERER FOR FREIGHT—NEGLIGENT LOSS OF VESSEL.
   Under a charter party by which the owner agreed to hold the charterer free of and indemnified against claim for loss or damage to cargo arising through the act, neglect or default of the master or crew, the charter freight is not recoverable where the ship was lost by stranding due to negligent navigation.

In Admiralty. Suit for charter hire. On exceptions to libel and to answer.

Convers & Kirlin, for libellant.
Wing, Putnam & Burlingham, for respondent.

ADAMS, District Judge. This is an action brought by the Burn Line, Limited, owner of the steamship Oakburn, to recover from the United States and Australasia Steamship Company, a second install-

ment of hire alleged to be due under a charter of affreightment, dated January 24, 1906, amounting to $14,964.48.

The libel alleges as follows:

"Third. On or about January 24, 1906, at New York, a charter party in writing was entered into between the libellant and the respondent by which the steamship Oakburn was chartered to the respondent to carry a cargo from New York to several named ports in Australia. The charter party contained, among others, this clause:

'5. Freight to be a lump sum, say:—£8225 if steamer discharges at three ports in Australia.

£9225 if steamer discharges at two ports in Australia and four ports in New Zealand.

£8725 if steamer discharges at four ports (4) New Zealand only.

To be paid in New York as follows:

One-third (1/3) less 3½ per cent. to cover interest and insurance, with demurrage at loading port, if any, to be advanced 10 days after final departure of the steamer from New York, Bills of Lading, as presented by Charterers having been duly signed; One-third (1/3) in London two months after sailing of steamer without discount, and the Balance after right and true delivery of the cargo in Australia $and/_{or}$ New Zealand less 2½ per cent. commission. Any freight which may be payable by Bills of Lading at ports of discharge, not exceeding the said balance to be accepted by owners without recourse to Charterers. The owners to pay all port charges, pilotages, and all customary charges paid by Steamers, and to pay Charterers an address commission of 2½ per cent. on the amount of Freight, to be deducted from the first payment of Freight.'

A copy of this charter party is hereto annexed, marked Schedule 'A,' and made a part of this libel.

Fourth. Thereafter the steamship Oakburn was provided by the respondent with a cargo at New York, under the above mentioned charter party, and was ordered by the charterers to proceed to two ports in Australia and four ports in New Zealand. The steamer with the cargo that had been provided as aforesaid, sailed from New York on her voyage to the above mentioned ports on April 18, 1906.

Fifth. In reliance on the charter party and the promise of the respondent to pay freight as therein provided the libellant incurred expense in bringing the vessel to New York, in connection with the loading of the vessel at that port in providing her with bunker coals and otherwise in preparing her for the voyage to Australia under the charter party. This expense would not have been incurred by the libellant but for the promise of the respondent as aforesaid.

Sixth. All the cargo loaded on the Oakburn at New York was procured for the vessel by the charterers and was the property of third parties other than the charterers. For all this cargo the charterers caused to be prepared and presented to the master of the vessel for his signature bills of lading in a printed form, of which a copy is hereto annexed, marked Schedule 'B,' and made a part of this libel. All the bills of lading were signed by the master as presented to him. All the bills of lading issued for the cargo contained, among others, this clause:

'Freight prepaid is considered earned at time of payment, and is not recoverable ship lost or not lost.'

All the bills of lading contained the notation that the freight thereunder was prepaid, except as to the sum of £135:18:6, which was collectible at ports of destination.

Seventh. Freight amounting to £9225 or more on account of the cargo shipped on the Oakburn under the bills of lading above mentioned was prepaid to and collected by the respondent at the port of New York.

Eighth. The first installment on account of freight under the above mentioned charter was payable in New York on April 28, 1906, and amounted to £3075. In making payment on account of this installment, the respondent made certain deductions as follows:

Address Commission.........................................£230 :12 :6
Interest and Insurance...................................... 107 :12 :6
Consignment Commission..................................... 10 :10 :0
Advertising ................................................ 10 :10 :0

                                                          £359 : 5 :0

The net amount paid by the respondent on account of the first installment was £2715 :15.

Ninth. The respondent has prepared and submitted to the libellant's agents a statement of account dated May 3, 1906, of which a copy is hereto annexed, marked Schedule 'C,' and made a part of this libel.

Tenth. According to the terms of the charter party, the second installment of freight amounting to £3075, was payable in London on June 18, 1906. On or about May 21, 1906, the steamship Oakburn and her cargo were lost by perils of the sea. This installment was not paid by the respondent to the libellant, although due demand has been made on behalf of the libellant that this installment be paid at the office of Baring Bros. & Co., Ltd., Bankers, 8 Bishopsgate, Within, London.

Eleventh. By reason of the premises, the sum of £3075, or in currency of the United States, $14,961.48, became due and payable from the respondent to the libellant. Payment of this sum has been duly demanded of the respondent by the libellant but has been refused, and the said sum still remains wholly due and unpaid and owing from the respondent to the libellant."

### The charter party referred to was as follows:

"United States & Australasia Steamship Co.

11 Broadway, New York, January 24th, 1906.

It is this day mutually agreed between the Burn Line Ltd. of Greenock Owners of the Steamship 'Oakburn' * * * and the United States & Australasia Steamship Company, of New York, as Charterers of said Vessel, as follows:

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"3. * * *, the steamer shall proceed with all possible despatch to Three ports in Australia between Fremantle and Brisbane (both inclusive); or to two (2) Australian Ports as above and/or Aukland, and/or and/or Wellington, Lyttelton, and/or Dunedin; with option of ordering Steamer to discharge at Four New Zealand Ports only. If ordered to New Zealand only, Charterers have the option of ordering steamer to commence discharging either at the north or south end of the Islands, always in geographical order, but not exceeding six ports of discharge in all, at Charterers' option, discharging at each port the Cargo for that port in the usual and customary manner agreeably to Bills of Lading, and so end the voyage.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

5. Freight to be a lump sum, say:

£8,225 if steamer discharges at Three ports in Australia.

£9,225 if steamer discharges at Two ports in Australia and four ports in New Zealand.

£8,725 if steamer discharges at four ports (4) New Zealand only.

To be paid in New York as follows:

One Third (⅓) less 3½ per cent. to cover interest and insurance, with demurrage at loading port, if any, to be advanced 10 days after final departure of the steamer from New York, Bills of Lading.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

16. The Master or Owner to attend daily, or when requested, at the Charterers' or Agents' Office to sign Bills of Lading as presented and as customary, and at any rate of freight, without prejudice or reference to this Charter, but Charterers, or their Agents, are authorized to sign Bills of Lading on behalf of the Master and Owners, against written authority from the Master, such authority to be binding upon the Owners. Tally clerks at Owners' expense shall be nominated by Charterers to measure and take a correct account of the cargo as received, a copy of which account with measurements to be handed to the Charterers as required by them.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

18. The Owners agree to hold the Charterers free of and indemnified against claim for loss or damage to Cargo arising through the act, neglect or default of the Captain, Officers or Crew, or from any cause whatever, after the goods have been delivered to the Steamer.

\* \* \* \* \* \* \* \* \* \*

21. The Act of God, Perils of the Sea, Fire, Barratry of the Master and Crew, Enemies, Pirates, and Robbers, Arrests and Restraints of Princes, Rulers and People, and others, Accidents of Navigation excepted; Strandings, Collisions, and all Losses and Damages caused thereby are also excepted, even when occasioned by negligence, default or error in judgment of the Pilot, Master, Mariners, or other servants of the Shipowners; but nothing herein contained shall exempt the Shipowners from liability to pay the damage to Cargo occasioned by bad stowage, by improper or insufficient dunnage or ventilation, or by improper opening of valves, sluices and ports, or by causes other than those above excepted; and all the above exceptions are conditional on the Vessel being Seaworthy when she sails on the Voyage, but any latent defects in the machinery shall not be considered unseaworthiness, provided the same do not result from want of due diligence of the Owners or any of them, or by the Ship's Husband or Manager. Owners agree to hold Charterers indemnified in so far as the said Negligence Clause may be contrary to the laws of the United States, and to accept the usual line form of Bill of Lading as customary in this Trade, with the conditions therein, and the same to form part of this Agreement. \* \* \* "

The bill of lading referred to contained this provision:

"Freight 10% primage and charges on the said goods to be paid, as per margin, in New York, on delivery of the Bills of Lading in cash at the current exchange for Banker's sight Bills, without deduction, and Steamer to have a lien on the said goods until such freight, primage and charges are paid \* \* \*.

Freight prepaid is considered earned at time of payment and is not recoverable, ship lost or not lost."

The statement of account referred to showed how the claim was made up.

The respondent filed exceptions to the libel and answer as follows:

"First. The respondent excepts to the relevancy, pertinency or competency of the averments of the sixth and seventh articles of the libel purporting to bring into this suit the terms of the bills of lading, issued for cargo engaged from others by this respondent, as the same were between outside parties and cannot be availed of by libellant.

Second. This respondent also excepts to the averments of the sixth and seventh articles of the libel regarding the prepayment of the bill of lading freight, as irrelevant and not pertinent, inasmuch as it was provided by clause 16 of the charter-party, that bills of lading should be signed at any rate of freight, 'without prejudice or reference to this charter.'

Third. This respondent also excepts to the libel in its entirety, as insufficient, and not stating any cause of action against this respondent, on the grounds following:

I. For that the libel and attached charter-party show that libellant undertook that the Oakburn should proceed to four discharging ports, and there deliver the cargo taken for such ports, whereby performance of libellant's contract in that manner was made essential to the earning, or recovery of any freight thereunder.

II. For that payment of one-third of the lump sum freight, two months after sailing, was an advance toward the performance of the libellant's contract, and was conditioned upon performance being possible when such sum should be so advanced.

III. For that it is not shown that any part of said undertaking was performed; or that any cargo was delivered, or can be delivered, at destination.

IV. For that it is shown that the Oakburn and cargo were lost before

reaching any port of delivery, whereby the performance of the voyage, and earning of freight became impossible.

V. For that after the loss of the Oakburn and cargo, no further advance of freight, or on account of freight, could be demanded.

VI. For that as no freight was earned under said charter-party, the libellant is bound to repay any advances on account of freight received before the loss of said ship.

VII. For that the libel contains no general or other averment of the truth of the matters therein propounded.

### Answer.

Without waiving said exceptions, but insisting upon all and several thereof, this respondent also makes answer to the allegations of the libel, as follows:

Fourth. This respondent admits the truth of the allegations contained in the first, second, third and fourth articles of the libel, excepting only the exactness of the appended copy of the charter-party marked as Schedule A. As to this, the respondent prays that the original thereof may for greater certainty be produced, and exhibited to this Court.

Fifth. This respondent has no knowledge as to the truth of the allegations of the fifth article of the libel and leaves the libellant to make proof of same, should it become material herein.

Sixth. This respondent admits the truth of the allegations of the sixth and seventh articles of the libel, although it has already excepted to the same, as having no bearing upon the issues herein.

Seventh. This respondent admits the truth of the allegations contained in the eighth and ninth articles of the libel.

Eighth. This respondent admits the loss of the steamer Oakburn and her cargo on or about May 21st, 1906; also that since that time libellant demanded a further advance of £3075 which has not been paid. Further answering, this respondent denies all the other averments of article tenth of the libel.

Ninth. This respondent denies all and singular the averments contained in the eleventh and twelfth articles of the libel.

Tenth. Further answering, this respondent alleges that by said charter-party the libellant undertook to carry said cargo to the several designated ports of delivery 'discharging at each port the cargo for that port in the usual and customary manner agreeably to bills of lading, and so end the voyage.'

Instead of performing said contract, the Oakburn as this respondent is informed and believes was so negligently navigated that she was stranded in a fog on Duiker Point, South Africa, on the morning of May 21st, 1906, whereby the performance was rendered impossible. This respondent charges, as faults and neglects, that said stranding and loss were occasioned by not setting a proper course, not sufficiently moderating the speed in the fog, not keeping a good watch, not properly sounding or using the lead, and inattention as the steamer entered shoal water, and in other faults which will be shown at the trial.

The respondent further shows that after the loss of the Oakburn, no cargo has been, or could be, forwarded to destination, or be otherwise delivered; and that no freight thereon has been, or can be, earned by the libellant, or by the master of the Oakburn, and that hence no advance thereon is now due to the libellant."

The libellant excepted to the tenth article of the answer in its entirety as immaterial, insufficient and as not stating any valid ground of defence to the matters complained of in the libel.

The libellant's contentions are:

### "First Point.

The second installment of the lump sum freight is due by the contract contained in the charter party, irrespective of the bills of lading, and regardless of the loss of the vessel and cargo, before it fell due.

### Second Point.

The provisions in the bills of lading that the freight should be paid in advance and that 'freight prepaid shall be considered earned' constitute a lawful agreement, and were embodied in the contract incorporated in the charter party so as to form a part of it. By force of those provisions this action can be maintained.

### Third Point.

The prepaid freight collected by the respondent under the owner's contracts contained in the bills of lading, is subject to an implied lien or trust for the payment of the advanced freight stipulated to be paid under the charter party."

The respondent's contentions are:

"I. The charter party being for a lump sum, the shipowner's compensation from the charterer is independent of any bills of lading.

II. The agreement to take the line bill of lading does not support libellant's claim to prepaid freight.

III. The charter-party did not contemplate any special engagements on the basis of prepaid freight being retained 'ship lost or not lost.'

IV. After total loss of the Oakburn, libellant cannot recover the second advance of freight.

V. Libellant cannot recover freight after a negligent stranding.

VI. Libellant has no claim on the charterer's profits."

As seen above, this charter party contained the provision that owners agree to accept the usual line form of bill of lading as customary in this trade with the conditions therein and the same to form a part of this agreement and the bill of lading contains the stipulation, quoted above, that freight should be considered earned at time of payment and should not be recoverable, ship lost or not lost. These bills can not be considered res inter alios acta. They are referred to in clauses 16 and 21 of the contract and became the libellant's contracts, hence it was bound by them.

The foregoing conclusion is substantially determinative of the controversies upon this aspect of the case. The respondent's points relate principally to what has been considered above. The authorities cited under the 4th point, including one decided by this court in 1902 (De Sola v. Pomares [D. C.] 119 Fed. 373), were upon a different state of facts. It is said in The Kimball, 3 Wall. (U. S.) 37, 44, 18 L. Ed. 50, cited in that case:

"Freight being the compensation for the carriage of goods, if paid in advance, is in all cases, unless there is a special agreement to the contrary, to be refunded, if from any cause not attributable to the shipper these goods be not carried."

Here there was an agreement to the effect that the bills of lading should apply to prevent recovery back of earned freights.

It was alleged, however, that there was a negligent stranding. Such being admittedly the case here, it seems that there can be no recovery of freight, hence the respondent's exception in this connection is sound. Under clause 18 of the charter, the owner agrees to hold the charterers free from liability for loss arising through the acts, neglect or default of the master, or crew and the libellant is precluded from demanding a further advance after such neglect has destroyed the subject matter of the contract.

What has been said in this connection relates also to the libellant's exception to the Tenth article of the answer.

The respondent's exceptions are overruled excepting such as relate to the loss of the cargo by negligence, which are sustained. The libellant's exception to the Tenth article of the answer is overruled.