## THE ALBERT F. PAUL.

### SOUTHARD v. BENNETT, DAY & CO. et al.

(Circuit Court of Appeals, Second Circuit. May 27, 1924.)

No. 328.

**1. Maritime liens ⬅65—Charter provision held evidence of creation of lien.**

Charter binding vessel, freight, tackle, and appurtenances, and merchandise, each to other in penal sum of estimated amount of charter, though in itself, mere penalty, *held* evidence of creation of lien.

**2. Maritime liens ⬅35—Goods shipped by charterer held subject to lien for freight, regardless of issuance of bill of lading.**

In absence of special agreement, goods shipped by charterers themselves are subject to lien for chartered freight, regardless of whether bill of lading was issued.

**3. Shipping ⬅154—Owner of chartered ship held not entitled to lien for freight against third parties, who prepaid freight to charterer.**

Where charter for specified voyage, providing hire was to be paid at end of voyage, contained no direction master should sign bills of lading, but he did sign bills showing prepayment of freight to charterer, shipowner was not entitled to lien for chartered freight against goods belonging to third parties.

**4. Shipping ⬅104—Owner of goods contracting with charterer for carriage in position of subcharterer.**

Owner of goods, who contracts with charterer for carriage, is in position of subcharterer, in that he engages enough space to accommodate his goods.

**5. Shipping ⬅145—Freight not due from charterers until they have full user of ship.**

Freight cannot be due from charterers until they have had full user of ship for purposes for which they chartered it, and master or owner has no supervision or control over freight charges until time for payment of charter hire.

**6. Shipping ⬅149—Bill of lading issued by master, conditioned on charter party, held to apply only to clauses of charter applicable to bill.**

Where master of vessel, chartered for voyage under charter not providing for issuance of bills of lading, before signing bill of lading for cargoes belonging to third parties, stamped thereon, "All conditions as per charter party," such clause brought in only those clauses of charter party applicable to contract in bill.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by Charles F. Southard, master of the American schooner Albert F. Paul, against cargo laden in said

schooner, claimed by Bennett, Day & Co. and others,. and Anderson T. Herd and another. From a decree for libelant against defendant Herd and another, but dismissing libel as against the res, libelant appeals. Affirmed.

Libel was filed by the master and part owner of the schooner Paul to enforce an alleged lien against the cargo of that schooner for the chartered freight. The schooner had been chartered to the Five Continents Corporation for a voyage from Para, Brazil, to New York City. The agreement of said corporation was in usual form, "To provide and furnish to said vessel a full and complete cargo," and to pay as hire under this voyage charter "$13 per ton on the basis of the vessel's guaranteed dead weight capacity; owners guarantee vessel's dead weight to be 1,125 gross tons; freight payable on arrival of the vessel at New York." Under this charter the charterer's agent at Para made freight contracts with divers shippers, whose goods were put on board and filled the vessel to her bulk capacity; but the merchandise shipped was so light that the vessel's dead weight was not reached.

The charter party contained no explicit direction that the master should sign bills of lading. It did contain the usual clause binding the parties to the agreement to the "true and faithful performance" thereof, and binding also "the said vessel, freight, tackle, and appurtenances, and merchandise to be laden on board, each to the other in the penal sum of estimated amount of charter." The goods having been placed on board, the charterer's agent called upon the master to sign bills of lading.

These negotiable bills are in a form prepared for the Five Continents Corporation, and are drawn in contemplation of a signature thus: "Five Continents Corporation, per [whoever signed the bill]." The bills were signed by the master, but not all of them after or near the printed phrase above quoted; but he did not in terms sign as master.

When the bills were presented to him they bore statements to the effect that the freight had been prepaid "to agent of Five Continents Corporation." At the master's request the bills were stamped, "All conditions as per charter party"; then the master signed them. The freight under all the bills was in fact paid to the charterer's agent in Para. What he did with it does not directly appear, though there is evi-

dence that he said he took it in order to forward it to the charterer in New York.

The goods were safely transported, but the charterer neglected to either receive or attend to the delivery of cargo, and paid neither the charter hire nor any of the other expenses laid upon him by the charter. Thereupon the shipowners unloaded the cargo, and by this suit assert a maritime lien against the cargo claimed by the several transferees of the said negotiable bills of lading.

The cargo owners appeared, claimed, and impleaded the charterer; also one Herd, who had guaranteed the charter. Herd appeared, answered, and then defaulted. The charterer defaulted in limine. The court below granted decree against Herd and the charterer, but dismissed the libel as against the res, whereupon libelant appealed.

McFarland, Taylor & Costello and Alfred H. Strickland, all of New York City, for libelant appellant.

Burlingham, Veeder, Masten & Fearey, Carl G. Stearns, and Roscoe H. Hupper, all of New York City, for cargo owners appellees.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] Argument for appellant asserts that the charter party gave the vessel a lien for freight. Such lien "generally is favored by the courts" (The Kimball, 3 Wall. 37–42, 18 L. Ed. 50), and the usual charter party engagement clause here used, and quoted above, although in itself a mere penalty (Watts v. Camors, 115 U. S. 353, 6 Sup. Ct. 91, 29 L. Ed. 406), is evidence that the creation of a lien to enforce the provisions of the charter party was present in the minds of the parties when they signed agreement (The Kimball, supra, at page 44). The lien has been held to arise by legal implication. Davis v. Smokeless Co., 196 Fed. 753, 116 C. C. A. 381. It may then be assumed (not held) that a lien for freight arose from this charter party. Yet the question remains: What freight? The chartered freight, or the bill of lading freight?

[2] It may be said on authority that all goods shipped by the charterers themselves, in the absence of any special agreement modifying or supplementing the charter party, would be subject to a lien for the chartered freight. Carver (6th Ed.) §§ 655 and 668. So far as charterer's liability is concerned, the issuance of a bill of lading is immaterial.

[3, 4] But this shipowner is asserting a lien for chartered freight against goods shipped by and belonging to third parties, who received therefor bills of lading. We shall assume, but not hold, that said bills were issued by the master, and not the charterer. If there had been a freight rate specified in those bills, the shipowner could have exercised his lien to the extent of the bill of lading freight and no more. The Albert Dumois, 54 Fed. 529; Larsen v. 150 Bales of Sisal (D. C.) 147 Fed. 783; Jebsen v. A Cargo of Hemp (D. C.) 228 Fed. 143. Of these cases, the one most often cited, The Dumois, is a case of a subcharter; but the owner of goods, who contracts with a charterer for carriage, is in the position of a subcharterer. He engages or charters enough space to accommodate his goods. It formally follows that, there being no freight, there was nothing on which a lien could operate.

But it is urged the master, by signing a bill of lading that on its face showed no freight due or to become due, varied the charter, something he could not do; wherefore any attempt at doing it was and is a nullity. This assertion we think untrue. The master certainly had no authority as master to change any agreement contained in the charter party, but in point of fact he changed nothing.

[5] On principle, irrespective of the terms of this particular charter party, the general rule was expressed in Brown v. Tanner, L. R. 3 Ch. 597; freight cannot be due from charterers on a charter party until they have had the full user of the ship for the purposes for which they chartered it. The transaction is analogous to the demise of property until the given purpose is answered. Therefore there is no general principle giving the master or owner any supervision or control over freight charges until the time comes for payment of charter hire. But here the charter party is plain, that no chartered freight was due until the vessel arrived in New York. Consequently the general principle was here specifically agreed to.

But equally was there no prohibition upon the charterers, who admittedly could and did put the schooner "on the berth," from collecting any charge for freight at any agreed time. Consequently it results, from the lawful rights of charterer and shippers, that when the master signed these bills of lading there was no freight due or to grow

1 F.(2d)—2

due, nothing upon which any lien could operate, and result is the same as when (supra) we regarded merely the forms of words used.

It seems to be thought that the union of ship and cargo, the engagement of each to the other, creates a lien, irrespective of whatever may be done before or at the effective date of union. The general doctrine is that the act of voluntary lading for transportation does create a mutual lien to secure performance of the contract made, and ordinarily one term of that contract is to pay freight (The Owego [C. C. A.] 270 Fed. 967); but here that term was absent, and again there was nothing out of which any lien could grow.

[6] It is probably true that the master, having some suspicion of his charterer, yet unwilling to refuse to sign bills of lading, thought to save the situation by requiring the bills to be stamped "all conditions as per charter party." But it is too well settled for discussion that such a clause in a bill of lading "brings in only those clauses of the charter party which are applicable to the contract contained in the bill." Gardner v. Trachmann, 15 Q. B. D. 154; Serraino v. Campbell, [1891] 1 Q. B. 283–301. Here there was nothing at all in the bill as issued which was or could be affected by the charter party. No conflict can be found between the charter provision for paying hire at so much per D. W. ton when the vessel reached New York, and collecting freight from strangers before shipment. Indeed, non constat that the schooner would ever get to New York.

Finally, it is most strenuously urged that the case below was erroneously decided in view of Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696. That report shows a charter party by Gracie to Chambers for a voyage from Philadelphia to Calcutta and return. The charterer, Chambers, went with the ship, and a cargo was brought back. This return cargo was (as found by the court) "expressly laden on board as the property of Chambers on his account and risk." Litigation arose because Chambers had made some agreements in Calcutta, with persons from whom he had procured the cargo, by which in effect he sought to postpone the payment of freight until the Calcutta vendors had been paid their price for the goods. The point is stated by Johnson, J. (page 634): "The question is not, how far his [Chambers'] contract may exempt the goods of another from freight, but how far he may incumber his own goods with a lien, which

shall ride over or supersede their general liability for the freight." We think this citation sufficient to show the inapplicability of the decision.

The facts excite some sympathy, but, hard as it is to trust a perhaps dishonest charterer, it would be harder still to make shippers pay twice.

Decree affirmed, with costs.