BLISS v. ANACONDA COPPER MINING CO. et al.

(Circuit Court, D. Montana. April 26, 1909.)

No. 280.

COSTS (§ 60*)—DISCRETION IN EQUITY—APPORTIONMENT.

The awarding of costs in an equity case is within the discretion of the court; and where, in a case in which large interests were involved, the law was not settled, and there was reasonable basis for the suit, although the bill is dismissed, the court may properly, in the exercise of such discretion, require each party to pay his own costs.

[Ed. Note.—For other cases, see Costs, Cent. Dig. § 265; Dec. Dig. § 60.*

Right to costs in equity, see note to Tug River Coal & Salt Co. v. Brigel, 17 C. C. A. 368.]

See 167 Fed. 342.

R. L. Clinton and C. M. Sawyer, for complainant.

A. J. Shores, C. F. Kelly, Forbis & Evans, and D. Gay Stivers, for defendants.

HUNT, District Judge. Pursuant to the order of the court heretofore made on January 25, 1909, hearing was had on February 15th, in order that the court might listen to the testimony of the superintendent of the Washoe Smelting Company, and such testimony as the parties chose to present upon the subject of possible means of so treating the flue dust at defendants' smelting works as to reduce the quantities of arsenic passing out of its stack, and thereafter making any such specific order as might seem equitable and right. Bliss v. Anaconda Copper Mining Co. et al. (C. C.) 167 Fed. 342.

In obedience to a subpœna issued, Mr. Mathewson, superintendent of the Washoe smelter, appeared and testified at considerable length. Reduced to the briefest statement, the substance of the evidence given by Mr. Mathewson was that there are several principal means known to science for the extraction of arsenic from fumes, and that none of them could be made applicable to the conditions existing at the Anaconda smelter, owing to the size of the works and attendant difficulties to be overcome. He said the process of cooling by water spray could not be used, for the reason, among others, that the product would be a mixture of acid water and mud, the quantity of which would be so enormous at Anaconda that it could not be disposed of in safety to the community, and that the drainage from this mixture would find its way to the streams, and make the waters dangerous to all animal life.

He testified regarding a method of cooling by the admission of air into bag houses, but said that it is an impracticable way, because the gas in the smoke would destroy the bags as fast as they could be supplied. The "bag-house method," as it is called, is successful in lead and zinc smelters; but, owing to the quantities of acid in the fumes from copper smelters, it is impossible to prevent the immediate destruction of the bags.

He also explained a radiation process, saying, however, that as by the methods now employed in the Washoe smelter all the particles are

caught, except the very finest, so far as known the radiation process would not be effective to catch the particles that are not now being recovered.

The witness also said that there is a freezing process, but that that could only be used by counting upon a very large product of poison mud, which, as heretofore explained, could not be left exposed without great danger to animal life. Where the quantity of mud produced by this process is small, it can be buried; but at the Washoe smelter, owing to the enormous amount that would be produced, burial would be impossible.

The so-called electrical discharge method was explained by Mr. Mathewson, and it was made quite clear that, owing to the mechanical difficulties encountered thus far, practical application of this process, as attempted in California, has not been a success, and could not be made effective at the Washoe, where the velocity of the gases is approximately, at the slowest, 20 times greater than at Selby, Cal. Prof. Cottrell, the inventor of this process, visited the Washoe smelter, and, after study of conditions there, was not willing to assure defendants of its success, without first making further experimentation, which he said he would conduct in California.

Mr. Mathewson also detailed the friction or wire process, now being constructed at the Boston & Montana copper smelter at Great Falls, Mont. The process consists of suspending thousands of wires from the ceiling of large chambers in a way to cause friction of the gases, and thus bring about a settling of the dust. Mr. Mathewson himself doubts the success of this experiment, but says that, if demonstration of its efficiency is had, it will be used by the Washoe Smelting Company. He expects final tests to be made during this year.

Another system testified to is the filtering of the gases through finely pulverized slag moistened with water. This, the witness said, would also result in the production of immense quantities of poison mud, and, moreover, has not been successful in Utah, where it has been tried.

The feasibility of decreasing the velocity of the gases was explained. This method, the witness said, would require the construction of a flue 20 times as great as the present Washoe flue, to decrease the velocity to 60 feet per minute. By this device the product recovered would be dust; but, comparatively speaking, the excess over that now saved would be so slight as not to make the process worth very serious consideration.

The use of centrifugal gas cleaners was mentioned; but that process would also mean the accumulation of great masses of acid mud, and thus involve the same problem of how to dispose of the poisoned mud and liquids therefrom without the utmost peril to life.

Mr. Mathewson closed his testimony by saying that the result of his own study, and of the extensive investigations and experiments made by engineers and scientists in Europe and America in behalf of the defendants, is that the Washoe Company has a system nearer perfection than any other yet devised for the purpose of treating arsenic fumes. He added, however, that he knew the system was not perfect, and that the defendants were still experimenting, and would continue

to study the question in the hope "that some day some improvement of practical value will be devised which we will promptly adopt."

Mr. Falding, a distinguished chemical engineer, also testified at the request of the court. He said that he was then under employment by defendants to make examination into methods for treating the fumes at the Washoe smelter, particularly with a view to possible manufacture of sulphuric acid, and that, although he had been in Anaconda only three weeks, yet he could say that, from such examination as he had made, the Washoe Company was employing the most modern and successful methods for the treatment of the fumes, but that he could not tell, at the time he testified, whether it would be feasible to manufacture sulphuric acid. He dwelt upon the problem of treating the fumes at Anaconda as of much greater magnitude and difficulty than that presented by the smelting operations at Ducktown, Tenn., or at other places, where he had made examinations. He stated that he was given directions to proceed with his investigations at Anaconda without limitation, to the end that his report might cover every problem presented within the special range of his qualifications.

After hearing these witnesses testify, counsel for the complainant said that they did not care to cross-examine at that time, as it would require knowledge to be gathered after consultation with experts (whom they said they had in mind), in order to enable them to be prepared to inquire into some of the matters testified to by Mr. Mathewson. Accordingly the court readily continued the further hearing until April 19th. On April 19th the matter was called, whereupon counsel for complainant stated that they desired to submit an offer. This offer is as follows:

"This cause having been set down for hearing on the 19th day of April, 1909, at Butte, Mont., the complainant at this time desires to finally submit this cause to the court, subject to the following offer on behalf of complainant and those farmers in Deer Lodge Valley who are similarly situated and similarly injured:

"(1) That the complainant and the farmers who are members of the Deer Lodge Valley Farmers' Association have offered, prior to the commencement of this suit, to submit to any fair arbitration, have at all times been willing to submit to any fair arbitration, and are now willing to submit the appraisement of their land and damages to the statutory form of arbitration, or any other fair arbitration; provided, however, that the complainant will not submit to any form of arbitration, unless those who have so largely and generously contributed to the bringing and maintenance of this suit shall also be allowed and offered the same arbitration as complainant, as the complainant is now, and at all times has been, by all ties of honor and good conscience bound to make no settlement, sale, or arbitration unless the members of the Deer Lodge Valley Farmers' Association, who own lands in the Deer Lodge valley and are similarly situated, and whose lands and property are subject to injury from the fumes emanating from the Washoe smelter, shall be accorded the same treatment by the defendant corporations as shall be offered to, or received by, the complainant.

"(2) That in the event an arbitration shall not be acceptable to the defendants, the members of the Deer Lodge Valley Farmers' Association will submit their damages to arbitration and their lands to condemnation, under the same statutory proceedings as land is now condemned for public use under the laws of the state of Montana; provided, however, that the complainant will not submit to condemnation until the same proceedings have

been taken against the members of the Deer Lodge Valley Farmers' Association.

"(3) That in so far as complainant is able to learn from corresponding with chemical engineers or engineering chemists, they could not secure the services of any such chemists, except under very unsatisfactory assurances, and at a very large compensation to be first paid to them; and the position taken now by complainant is that under the admissions of Mr. E. P. Mathewson, superintendent of the Washoe smelter, and the undisputed proof offered by complainant, that from 10 to 30 tons of arsenic per day, besides a large amount of sulphur in various forms, to wit, about 5,000,000 pounds per day, is being emitted into the atmosphere by the Washoe smelter. The pollution of the air and the magnitude of that pollution is not now open to dispute, and the complainant's position is that it is the duty of the defendants to devise ways and means to prevent such pollution; and the complainant is not in a position, and is not able, to devise ways or means by which the defendants can precipitate the poisonous or injurious substances at a commercial profit, or treat or dispose of the large poisonous by-product which would follow such precipitation; and we respectfully urge that the court should, by a proper order, compel the precipitation of the poisonous substances before the fumes are released into the atmosphere, or enjoin the further operation of the Washoe smelter, unless the defendants should accept complainant's proposed arbitration or condemnation."

Counsel offered in evidence the transcript of the testimony of Mr. Mathewson and Mr. Falding, heretofore referred to, and thereupon submitted the matter without introducing any witnesses. In this way the matter is presented for final decision.

I can only regard those portions of complainant's offer, wherein he expresses a willingness to submit to arbitration, provided all members of the Deer Lodge Valley Farmers' Association, whose lands are subject to injury from defendants' smelter, shall be "accorded the same treatment" as shall be offered to complainant, and those portions of his offer wherein complainant says he will submit to condemnation of his lands according to such rules as govern condemnation proceedings in the state of Montana, provided similar condemnation proceedings are instituted by defendants against the several members of the Deer Lodge Valley Farmers' Association, as entirely irrelevant to the matter specified in the order of the court, and which constituted the ground for the retention of the bill in the case. Mr. Bliss, as already said in the opinion, is the only complainant before the court, and there is no authority in this tribunal to make any order whatsoever which can in any way adjudicate possible rights between the several members of the Deer Lodge Valley Farmers' Association and these defendant companies. Courts of equity are circumscribed in their powers by the rule that the relief which may be granted must be agreeable to the bill. Accordingly, we are brought right back to the only question which was reserved; that is, whether there is any device or method known at the present time whereby defendants can reduce quantities of arsenic escaping from the stack, and at the same time be permitted to continue the operation of their smelting plant.

Defendants have shown that they are doing all they can, considering the state of the art, and that they intend to continue their efforts, hoping for better success than they now can attain. Complainant has not attempted to dispute the truth of the evidence introduced by defendants upon the supplementary hearing, and does not contend that

it is improbable or contrary to scientific truths. The case then resolves itself into a condition where the conclusions and decision, which denied an injunction order stopping the works, control; and the court how, after the further hearing, can find no facts upon which to base a decree imposing conditions as to processes or mechanical devices to be used in operating the defendants' works, and permit the smelting operations to continue, and is without power to fix or to enforce any such conditions relating to arbitration or condemnation as are included in complainant's offer. The case of McCleery v. Highland Boy (C. C.) 140 Fed. 951, is not applicable, for there the decree was strictly between record parties to the litigation, and did not attempt to bind others than the parties.

The offer of complainant will be filed; but the first two paragraphs must be disregarded, as containing matter having no bearing upon the case, while the substance of the third paragraph is disposed of by saying that it relates to the principal subjects covered by the opinion filed.

The question of costs is also serious. The usual rule in equity is that the party found entitled should be reimbursed the expense of defending his rights. It is, however, a recognized doctrine that costs in equitable suits are subject to the sound judicial discretion of the court, and, where it appears that complainant had good reason to think the defendant was liable upon equitable principles, the court does not necessarily award costs against him, but may ascertain what sound discretion requires to be done under the facts of the case. It can be said that the questions involved in this litigation were not thoroughly well settled when this complainant brought his suit. There was wide room for difference of opinion. It has been since this suit was instituted that the Supreme Court of the United States rendered its decisions in Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956, Georgia v. Tennessee Copper Company, 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038, and Dun v. Lumbermen's Credit Association, 209 U. S. 20, 28 Sup. Ct. 335, 52 L. Ed. 663, and that the Circuit Court of Appeals of the Eighth Circuit decided the case of American Smelting Co. v. Godfrey, 158 Fed. 225, and that the Circuit Court of Appeals of the Ninth Circuit has laid down the law in Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621, and in McCarthy v. Bunker Hill & Sullivan Mining Co., 164 Fed. 927. Upon careful consideration, I conclude that it is equitable that each party herein shall pay his and their own costs. The Scotland, 105 U. S. 24, 26 L. Ed. 1001; Adams, Equity, *392; Brooks v. Byam, Fed. Cas. No. 1,949; Grattan v. Appleton et al., Fed. Cas. No. 5,707; Goodyear v. Sawyer (C. C.) 17 Fed. 2; Clark v. Reed, 11 Pick. (Mass.) 446.

It is therefore ordered that the bill be dismissed, complainant to pay his costs, and defendants to pay their costs. The dismissal is, of course, without prejudice to the institution of any action for damages actually sustained by complainant, or such other suit as may be proper under the rule recognized in McCarthy v. Bunker Hill & Sullivan Mining Co., supra.