**CHICAGO SUGAR CO. v. AMERICAN SUGAR REFINING CO. (two cases).**

Nos. 9158, 9159.

United States Court of Appeals
Seventh Circuit.

July 11, 1949.

Rehearing Denied Sept. 14, 1949.

Leslie M. O'Connor, Chicago, Ill., for Chicago Sugar Co.

Kenneth F. Burgess, Howard Neitzert, Geo. A. Ranney, Jr., John R. Taylor and Sidley, Austin, Burgess & Harper, Chicago, Ill., for American Sugar Refining Co.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

KERNER, Circuit Judge.

By the appeal in No. 9158 plaintiff challenges the propriety of a judgment dismissing its complaint after a trial upon the merits. In No. 9159 defendant appeals from that part of the same judgment which taxed to defendant one-half of the costs of the proceedings before a master.

The complaint contained three counts. The first two counts charged violation of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a) and (e) and sought to recover three-fold damages. The third count sought damages for breach of contract. After defendant had filed its answer, the cause was referred to a master for hearing and to report his

conclusions and recommendations. The master having heard the cause, filed his report. He made 79 findings of fact. He also made conclusions of law and recommended that the cause be dismissed. Exceptions to the report were filed and overruled, and the report of the master was approved. In the judgment order dismissing the cause, the court adopted the master's findings of fact and conclusions of law.

The issue is whether the acts of defendant were discriminatory within the meaning of § 2(a) and (e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a) and (e). Under § 2(a) it is unlawful to discriminate in price between different purchasers of commodities of like grade and quality where the effect may be to substantially lessen competition or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. And § 2(e) forbids preferential services or facilities connected with the sale of a commodity upon terms not accorded to all purchasers on proportionally equal terms.

Plaintiff, an Illinois corporation, is a distributor engaged in the business of buying and selling sugar, largely with industrial users. Defendant, a New Jersey corporation, is engaged in the business of buying and refining raw cane sugars and in selling domestic refined cane sugars and sugar products. In 1936 and 1937 there were 14 domestic cane refiners in the United States which, with the exception of those owned by Western Sugar Refinery and California & Hawaiian Sugar Refining Corporation (hereinafter referred to as "Pacific Coast Refiners") and located in San Francisco, California, were located along the Gulf and Atlantic coasts. Sugar is a standardized commodity, and the sugar business is extremely competitive. A customer will pay no more for one refiner's brand than for another; price and terms rather than brand control its sale and distribution, and no seller of sugar can continue in business unless he gives his customers the same privileges any other refiner gives. All domestic cane refiners sell their sugar through brokers on substantially the same terms. Two types of contracts are offered to the trade by refiners: (a) contracts containing specifications for the immediate sale and delivery of the sugar, and (b) contracts not containing specifications, referred to as 30-day contracts.

The 30-day contract form does not require contract bookings to be withdrawn within the guarantee period applicable to the contract. The guarantee period is not mentioned in the contract form, but, pursuant to announcement, contract prices may be guaranteed for 30 days, 42 days, or not guaranteed at all; yet, in all except in very unusual cases the delivery period as stated in the contract form is 30 days and delivery specifications are required of the purchaser within 15 days from the date of the contract. Many contracts do not carry a guarantee, yet the delivery period is determined in precisely the same manner as in the case of guaranteed contracts.

Most of the sugars sold by refiners are through the medium of 30-day contracts, entered on market moves. A market move develops when refiners announce an increase in their basis prices. Ordinarily a price increase is announced the day before a new and higher price becomes effective. In the interim between the announcement and the effective date of the new price, sugar buyers enter into 30-day contracts with refiners, booking such amount of sugar as the seller will accept or as the buyer may consider to his advantage. These 30-day contracts do not contain specifications as to the grade, kind, style of package, or quantities of sugar to be delivered, nor are the dates on which the sugars are to be delivered specified. They contain a provision that the buyer agrees to buy and the seller agrees to sell a designated number of 100-pound bags of refined cane sugar at a basis price per pound. When sugars booked on a 30-day contract form are delivered to the customer, the deliveries are made pursuant to delivery specifications furnished by the purchaser, stating the kinds of sugar and amounts desired, and the refiners make

deliveries until they advise their customers to the contrary. While the contract forms used by the various refiners differ in their terms, all require the purchaser to buy and the seller to sell specified quantities of sugar at a firm price, the sugar to be delivered within 30 days of the contract unless otherwise indicated.

The provisions of the 30-day contract forms requiring purchasers to specify for delivery sugars booked under the contract within 15 days of the contract date and to accept delivery within 30 days of the contract were ignored by both buyer and seller from the date of the introduction of the 30-day contract form, and buyers withdrew sugars if, as and when they desired so to do, and it became common practice for all refiners to make deliveries until they notified their trade to the contrary. No effort was made by any refiner to require its customers to withdraw contract bookings, and undelivered contract balances were cancelled at the request of the buyer.

On January 4, 1937 the parties executed two 30-day contracts. By contract No. FA-21160, plaintiff agreed to buy and defendant agreed to sell 75,000 100-pound bags, and by contract No. FA-21161, 25,-000 100-pound bags of refined sugar. The parties agree that the language of the contract did not express their true agreement, and both parties disregarded the rights and obligations provided by the contracts with respect to furnishing specifications, the withdrawal of contract balances or the delivery of sugar booked under the contracts. They also agree that the contracts were supplemented or modified by the course of dealing between the parties since January 1, 1932, and by public announcements outlining the basis upon which business was accepted under the contracts.

About 1936 California & Hawaiian Sugar Refining Corporation (hereinafter referred to as C. & H.), to improve its competitive position in the central States, offered to guarantee its 30-day contract price against a decline in its own basis price for 42 days following the date of its contracts. This move by C. & H. was met with like terms by other refiners, and the terms so offered became known as "guarantee terms" or as "the guarantee" and there evolved in the trade a term known as "the regular 42-day guarantee" and thereafter 42-day guarantee terms were extended to purchasers holding 30-day contracts to withdraw sugars booked at the lowest basis price during the first 42 days following the date of the contract.

Having given their customers cause to believe that they would not be required to withdraw 30-day contract bookings if they did not desire to do so, the refiners were confronted with the problem of inducing withdrawals and with the further problem of disposing of undelivered contract balances in cases where the buyer could not be induced to make such withdrawals. They devised various expedients for extending guarantee terms to the unguaranteed contract balances, two of which were known as "extending the guaranty period" and "re-entering contract balances." Re-entering January 4 contracts involved no making of new contracts, and when contract balances were re-entered, the refiners extended to their customers holding undelivered contract balances the same rights and privileges with respect to such contract balances as though the old contracts were cancelled, and upon the customer's request they would cancel undelivered contract balances.

Two methods were devised for the disposition of undelivered contract balances in cases where the customer failed to withdraw such balances. The practice was to advise contract holders by letter or public announcement that unless the balances were withdrawn by a specified date in the future, the contracts would be cancelled. By the other method the refiners announced that they would permit customers to cancel the outstanding contracts. The extension of guarantee terms, the re-entry of contract balances, the cancellation of contract balances and the offer to cancel contract balances are competitive terms, and when extended by one refiner to its customers, competing refiners are required to offer like or similar terms in order to hold the good will of their customers.

From January, 1932, until November 5, 1936, there were 32 market moves on which 30-day contracts were entered into between the parties, and during 1936, deliveries were made to plaintiff many days after the 30-day contracts had expired. January 4, 1937, the cane refiners announced that effective January 5, they would advance their basis prices from 4.80 cents to 5 cents per pound. In the market move which followed, substantial quantities of sugars were booked on 30-day contract forms, but withdrawals were light during January and February. February 11 the Pacific Coast Refiners announced a decline in their basis price. Other refiners met this competition. February 15, 1937, the 42-day guarantee contracts entered into on the January 4 move expired. At this time substantial balances were outstanding under the January 4 contracts. February 5, the Pacific Coast Refiners announced that upon the customer's request, they would cancel undelivered contract balances. This announcement placed customers of the Pacific Coast Refiners on a more favorable basis than customers holding 30-day January 4 contracts with eastern and southern refiners whose outstanding contract balances were unguaranteed and who were not free to enter new business because of such contract balances. Defendant and the other eastern and southern refiners promptly met this competition by extending guarantee terms on January 4 contract balances. Plaintiff did not request cancellation of its January 4 contracts, but its president expressed his satisfaction with defendant's extending guarantee terms to the contract balances.

In March, 1937, defendant announced that a sugar control bill introduced in the United States Senate on March 2 provided for the imposition of an excise tax on refined sugar manufactured after April 1, 1937, and that if the bill became a law in that form, all refined sugar manufactured in the United States before April 1 would be exempt from the tax. March 5, C. & H. announced that it would terminate the guarantee applicable to its 30-day contracts as of March 31, 1937. Defendant followed suit on March 6, and announced that it

had extended its guarantees so that the guarantees would expire not later than March 31.

The demand for sugar during the month of March was exceedingly heavy, the deliveries being over 300% of their normal volume, with the result that it was impossible to buy sugar except in the form of contract withdrawal, and on March 17 defendant announced that as against January 4 contract balances, it could not obligate itself to make delivery of any sugar before April 1, unless specifications and shipping instructions were furnished.

At this time plaintiff was in the same position as all other customers of defendant in that it had the right and privilege as to when and how it would take delivery of sugars booked on the January 4 market move. Defendant did not require plaintiff to withdraw and take delivery of the sugars, nor did the contracts require plaintiff to withdraw or take delivery of the sugars; nevertheless, plaintiff elected to withdraw and take delivery of the sugars, and on March 6, a broker handling plaintiff's January 4 contracts telephoned to defendant an assortment of sugars amounting to 63,750 bags, to be placed in warehouses in Chicago, to be available to plaintiff prior to April 1. These sugars, together with sugars then held in the warehouse by defendant for plaintiff, were the equivalent of the undelivered balance due plaintiff under its contract No. FA-21160.

On March 9, 1937, plaintiff's president informed defendant that Purity Bakeries, one of plaintiff's customers, would withdraw balances due plaintiff under contract No. FA-21161, and that he was anxious to obtain title to outstanding contract balances prior to April 1 when it was anticipated that the tax bill would become effective, and offered to take delivery of sugars at defendant's refineries if that would facilitate delivery and pass title to the sugars that were undelivered under the January 4 contracts. Thereupon defendant submitted a plan for the delivery of balances due plaintiff to which plaintiff agreed. Pursuant to the plan the sugars were delivered, but because of the demands on

defendant's shipping and refining facilities, the deliveries were not completed until April 14, 1937.

The demand for sugars disappeared about the middle of April when it became apparent that the Sugar Tax Bill would not pass, and there was little activity in the trade. Contract balances were unguaranteed and new business was offered without a guarantee. May 12, C. & H. issued an announcement reinstating guarantee terms and re-entering January 4 contract balances. Similar announcements were made by at least six other domestic cane refiners, and defendant met this competition. The reinstatement of guarantee terms and the re-entry of contract balances marked the beginning of a new period of intense competition, and within a few days the market began to show signs of weakness and refiners cut their prices. May 20, 1937, a refiners' basis price of 4.70 cents per pound became effective. To meet this competition, defendant announced that its basis price was 4.70 cents per pound, specifications with order, prompt shipments, guarantees in effect to apply as theretofore. May 25, all of the refiners announced that on the buyer's request, they would cancel re-entered January 4 contract balances.

On May 26, 1937, defendant announced that balances against contracts booked on January 4 at 4.80 basis price were guaranteed to 42 days from May 11, and its customers were offered the privilege of cancelling. This offer was in effect an offer to re-enter contract balances under terms applicable to new business and to accept new contracts without regard to whether a customer held or had held an undelivered balance. At that time plaintiff cancelled balances, inactive since April 14, amounting to 40,432 bags. June 10 the refiners reduced their basis price to 4.50 cents and on that date defendant also announced that its basis price was 4.50 cents per pound, prompt shipment on 30-day contracts with guarantee against decline but not beyond 42 days from contract date.

Plaintiff had considerable sugar delivered during March and April at defendant's refinery in Louisiana, which had been paid for in whole or in part in June after the price decline, and although there were no outstanding balances between the parties in March and April, 1937, under the re-entered January 4 contracts, the price decline on June 10 did affect the price paid by the trade for sugars previously delivered. Nevertheless when defendant reduced its basis price in June, it did so in good faith to meet identical terms previously offered by its competitors and not for the purpose of discriminating against plaintiff or any other customer. Plaintiff was accorded all the privileges and advantages of all other customers holding January 4, 30-day contracts. And there was no proof that any of defendant's customers had received more favorable prices or terms with respect to sugar booked on the January 4 move than those received by plaintiff.

During the five years preceding January 1, 1937, plaintiff had withdrawn all contract balances during the guarantee period applicable to such contracts on six occasions, although bookings had been made with defendant on 32 market moves during this period, and defendant had re-entered contract balances on at least five occasions when plaintiff held contracts with defendant.

Based upon these facts, the court concluded that by the public announcements of defendant and by its course of dealing with plaintiff, the provisions of the January 4 contracts were amended and modified; that defendant had waived the provision in the contracts requiring plaintiff to furnish specifications for the delivery of the sugars within the period mentioned therein, and any obligation requiring plaintiff to withdraw the sugars within 30 days or within any other period of time; that plaintiff did not consider itself legally obligated nor was it in fact obligated to withdraw sugars booked under the contracts; that plaintiff withdrew its January 4 contract balances voluntarily; that none of defendant's public announcements were made for the purpose of discriminating against plaintiff or any of its customers, but were made in good faith to meet similar terms offered by defend-

ant's competitors; and that defendant violated no duty or obligation to plaintiff in reinstating guarantee terms and re-entering contract balances or by the price decline of sugar.

Plaintiff's contention is that defendant was guilty of discrimination in price between purchasers under the January 4 contracts. We experience some difficulty in comprehending just what it is that plaintiff claims and in what manner defendant discriminated. In its brief plaintiff says that the issue involves "(a) refusal of cancellation rights in February-March and their granting on May 26, 1937; (b) price reductions on January 4 contracts deliveries under guarantee reinstatement of May 12; (c) relieving buyers who did not take delivery by March 31 of carrying costs—storage, interest, insurance, etc.; (d) enabling such buyers to get sugar at 4.70¢ and 4.50¢."

As we understand it, the conduct which plaintiff charges resulted in discrimination arose out of defendant's alleged misrepresentation with respect to cancellation rights under the contracts, that is, defendant's failure to require all its customers to withdraw January 4 contract balances prior to March 31, the re-entry of such contract balances under guarantee terms, and the cancellation of such balances in May. Plaintiff argues that defendant's announcements were, in fact, notice to the trade that contract balances had to be withdrawn before March 31, which it did, to its disadvantage in comparison with other customers, its competitors. It also says that even if it be assumed that plaintiff was under no obligation to take the sugar, it is no defense that plaintiff "owed no duty contractually or otherwise" to defendant to take the sugar.

■ Before proceeding to discuss plaintiff's contention it is well to say that parties to a contract always have the right, by agreement or their course of conduct, to waive the requirements of their contract. And it has been held that one of the parties to the contract cannot by a long course of conduct lead the other party to believe that it will not insist upon a strict performance of a duty imposed by the contract, and then without notice insist upon strict performance. Hubshman v. Louis Keer Shoe Co., 7 Cir., 129 F.2d 137, 140. What facts will constitute a waiver is a matter of law, but whether the facts exist in any given case is a question of fact. Aetna Life Ins. Co. v. Sanford, 200 Ill. 126, 130, 65 N.E. 661, and Baxter v. Metropolitan Life Ins. Co., 318 Ill. 369, 149 N.E. 243. We think there was competent evidence warranting the conclusion that by the course of conduct between the parties, the January 4 contracts had been amended as found by the court.

■ It cannot be gainsaid that before plaintiff may maintain its suit it must establish that defendant has violated the Robinson-Patman Act, and only discriminations that lessen or tend to prevent competition between customers or between sellers are prohibited. Section (2) (a), 15 U.S.C.A. § 13(a), and Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667, 676. There must be proof that a seller has charged one purchaser a higher price for like goods than he charged one or more of the purchaser's competitors. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 45, 68 S. Ct. 822, 92 L.Ed. 1196, 1 A.L.R.2d 260.

■ It is clear that plaintiff was not obligated to withdraw sugars under the January 4 contracts within 30 days, and that plaintiff withdrew the sugars voluntarily. It is also clear that no secret terms or concessions had been extended by defendant to any customer holding a January 4 contract. Plaintiff was subjected to no inducements that were not accorded to every other customer. All of defendant's customers were treated alike. All terms applicable to these contracts were made in good faith and publicly announced to meet similar terms offered by defendant's competitors, and all contract holders were privileged to take advantage of the terms so announced. The announcements contained no misrepresentation of fact, nor any suggestion that contract balances be withdrawn; they were made in good faith to meet identical terms previously offered by defendant's competitors and not for the

purpose of discriminating against plaintiff, and specifically stated that customers should determine for themselves whether it was in their interests to withdraw contract balances. The announcements did not constitute a promise or representation that guarantees would not be reinstated. There was no proof that defendant charged one purchaser a higher price for the sugar than it had charged plaintiff under similar circumstances, and there was no evidence that the announcements lessened or tended to prevent competition between defendant's customers. In this situation, we think the District Court was justified in holding, under the first count of the complaint, that defendant was not guilty of discriminating in price between different purchasers under the January 4 contracts.

Under the second count, the conduct which plaintiff charges resulted in discrimination was defendant's classification of customers as manufacturers and distributors, the offer of contracts only to the manufacturing trade, i. e., the claimed elimination of plaintiff as a distributor of defendant's sugar, and the repricing of these contracts.

We state the facts pertaining to this count. As already noted, plaintiff is a distributor. A sugar distributor is in a position to change his prices promptly to reflect changes in prices and costs, but manufacturers who have contracted to sell the output of their plants for some periods in advance, must speculate on the costs of sugars required in their manufacturing operations, unless, at the time they sell their merchandise they are able to determine their costs of sugars during the period of manufacture. Thus, manufacturers occupy a situation different from the position of the distributing trade. While the 30-day contract is adapted to the requirements of the sugar distributor, manufacturers have objected to the 30-day contract form because the seller had the right to discontinue deliveries at the end of 30 days.

Various attempts had been made by certain refiners and other sugar sellers over the years to devise some form of contract which would meet the requirements of manufacturers. To meet the needs of the manufacturing trade, defendant on November 9, 1936, offered the trade a contract for the delivery of sugar at a fixed price throughout 1937. The contract was known as a "Manufacturer's Contract," and under it the customer was required to specify definite quantities and periods for the delivery of the sugar, and the price was higher than the price at which 30-day contracts were offered to the distributing trade. The contract did not carry any guarantee against decline in price, and buyers were required to obligate themselves not to re-sell the sugar and agree to use the sugar solely for their own manufacturing purposes. Without the covenant, sugars sold to manufacturers could have been resold by the manufacturers in competition with sugars offered by the distributing trade, but defendant took precautions to insure observance of the covenant obligating the manufacturer not to re-sell the sugar. No part or portion of the sugar sold under the contract was ever resold.

The sugar under the "manufacturer's contract" was offered at a basis price of 4.70 cents. At that time 30-day contracts were offered at 4.65 cents. November 11, a basis price of 4.80 cents became effective for 30-day contracts. November 16 the basis price for manufacturers' contracts became 4.85 cents and thereafter remained at least 5 cents higher than the basis price for 30-day contracts, until the manufacturers' contracts were withdrawn from the market in May, 1937.

On May 26, 1937, to meet terms offered by its competitors, defendant repriced deliveries under the manufacturer's contract to eliminate carrying charges and to extend to customers holding those contracts the same terms as had been extended to customers buying 30-day contracts on the January 4 move, and offered all such customers the privilege of cancelling. The announcement did not place manufacturer's contract holders in a more favorable position than that enjoyed by holders of 30-day contracts entered on the January 4 move.

Plaintiff's president testified that it was hard for him to estimate what real damage was done to plaintiff and when asked whether he knew what damage plaintiff sustained as a result of the matters referred to in the second count, he testified: "In a general way, no, because I do not know to whom you (defendant) gave these contracts, whether you gave them to customers of mine (plaintiff's) and cut me (plaintiff) out of a possible profit because of no opportunity of doing business with them or not." Thereafter it was stipulated that plaintiff made no claim to damages for loss of business or for loss of customers. And there was no proof of any damage caused by the fact that plaintiff was not eligible for the manufacturer's contract.

The court concluded that defendant's classification of its customers as manufacturers and distributors was reasonable and lawful; that there was nothing in the terms announced by defendant on May 26 which was discriminatory; that defendant had not violated § 2 of the Robinson-Patman Act, or any part thereof, and that plaintiff had not been injured in its business or property as the result of any act or omission of defendant.

■ To be sure, under certain circumstances a seller of personal property cannot restrict the future alienation of the property, but if the restrictions are reasonable they will be upheld. See 5 Williston, Contracts, Rev.Ed.1937 at pages 4604-5; Wilder Mfg. Co. v. Corn Products Refining Company, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, Ann.Cas.1916A, 118; and Fosburgh v. California & Hawaiian Sugar Refining Co., 9 Cir., 291 F. 29. We fail to see, under the facts in this case, where and in what manner the effect of the covenant requiring the manufacturer to agree that he will not resell the sugar but will use it for manufacturing purposes, was harmful to competition, or in restraint of trade. It seems to us that whatever restraint there was, was reasonable. It prevented manufacturers from re-selling the sugars, delivered under the contract in competition with the distributing trade. Plaintiff should not complain of that fact.

We pass now to consider plaintiff's claim that the offer of the contract only to the manufacturing trade eliminated plaintiff, to his injury, as a distributor of defendant's sugar.

In support of its argument, plaintiff relies on Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196, 1 A.L.R.2d 260, and Elizabeth Arden, Inc. v. Federal Trade Commission, 2 Cir., 156 F.2d 132. We have studied these cases, but we are not convinced they support plaintiff's position.

The issue in the Morton Salt case was whether the seller, the salt company, had charged one purchaser a higher price for the salt than it had charged one or more of the purchaser's competitors. The Commission found that the competitive opportunities of certain merchants were injured when they had to pay the salt company more for their goods than their competitors had to pay. Here the manufacturers paid more for the sugars than was paid by plaintiff as a distributor, and had the manufacturer's contract been made available to the distributing trade, plaintiff would not have bought sugars under the contract to supply its regular business requirements.

In the Arden case, the Commission concluded that petitioners had violated § 2(e) of the Act because petitioners had not accorded demonstration service to purchasers who were in competition with purchasers to whom they did furnish such service. This is not our case. Here there was no discrimination between competing purchasers in connection with the offer by defendant of the manufacturer's contract to the manufacturing trade.

In the instant case there is no proof nor is it claimed that any distributor-competitor of plaintiff bought sugar from defendant under the manufacturer's contract, or that the contract effected any competitive injury between customers competing in the distribution of the sugar. However, plaintiff makes the point that the Act applies to sales of commodities to manufacturers using them, identically as it applies to other purchasers, and to discriminations whose effect may be to injure, destroy or prevent competition with any person who grants

such discrimination, and argues that the manufacturer's contract was offered for the purpose of diverting to defendant the business of manufacturers using sugar.

To be sure, the statute requires no more than that there shall be no discrimination in favor of "one purchaser against another purchaser * * * of a commodity bought for resale * * * by contracting to furnish or furnishing * * * any services or facilities connected with the * * * sale, * * * of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." But, of course, discrimination by a seller of a commodity cannot lessen competition between customers under the Act unless the discrimination is between customers competing in the distribution of the commodity, Corn Products Refining Co. v. Federal Trade Commission, 7 Cir., 144 F.2d 211, 214, affirmed 324 U.S. 726, 734, 65 S.Ct. 961, 89 L.Ed. 1320, and Samuel H. Moss, Inc. v. Federal Trade Commission, 2 Cir., 148 F.2d 378. That is to say, the parties must be in competition with each other. There is nothing in the Act that prevents a seller of a commodity from eliminating middlemen from its distributive system and selling its commodity directly to consumers if it wishes to do so; and if it chooses it may distribute a part of its commodity direct and a part through wholesale distributions. Jarrett v. Pittsburgh Plate Glass Co., 5 Cir., 131 F.2d 674; Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 150 F.2d 988, 161 A.L.R. 370. See also General Shale Products Corp. v. Struck Construction Co., D.C., 37 F.Supp. 598, affirmed, 6 Cir., 132 F.2d 425, certiorari denied, 318 U.S. 780, 63 S.Ct. 857, 87 L.Ed. 1148.

Finally we reach the contention that defendant violated the Act when on May 26 it repriced manufacturers' contracts and permitted cancellation of undelivered balances.

The announcement merely relaxed the terms of the manufacturers' contracts. Hence in view of what we have already said, it will be enough to say that we agree with defendant that any relaxation of the terms of the manufacturer's contract was not a violation of the Act. The differences in the terms offered manufacturers and those offered distributors as revised by the announcement were justified by the same considerations that we have already pointed out, and this is dispositive of plaintiff's contention. We conclude that the court was right in holding that defendant had not violated § 2 of the Act or any part thereof.

The court found that plaintiff had abandoned count three and concluded that it had not proved a breach of contract as alleged in that count. We have not discussed that count or any evidence claimed to sustain it because the plaintiff has not raised any question concerning it. Plaintiff, however has argued other points mostly subsidiary to the ones already discussed. These we have considered, but since they do not change our conclusions they need not be discussed.

In No. 9159, defendant appealed from the part of the judgment directing it to pay one-half of the $9,130 fees and charges of the master. The judgment was predicated on the recommendation of the master that:

"A substantial part of the time necessarily spent in hearings herein, was in reviewing the Defendant's business transactions over a number of years in order to properly construe its January 4th, 1937 contract with the Plaintiff; which contract, although appearing definite in its terms, Defendant contends is a mere option at the election of the purchaser * * *

"While the Master does not presume to suggest to the Defendant the provisions its contract should contain, nevertheless, if the three words 'at purchaser's option' were contained in the Defendant's 30-day contract it would have avoided the necessity of reviewing approximately twenty years of the Defendant's business dealings under the same form of contract, to establish by custom and usage the fact that the contract in question is a mere option."

It thus appears that although the master had found plaintiff's charges completely groundless and defendant's conduct in the accused business dealings wholly innocent and carried on in good faith, nevertheless, because he considered defendant responsible for the difficulty and complexity of

the proofs of that innocence and good faith, he charged half of the expense of such proofs to defendant.

While there is no question that, under Rule 54 (d), Rules of Civil Procedure, 28 U.S.C.A. which provides: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; * * *" the court has discretion over the allowance of costs, we think the facts disclosed did not justify the exercise of that discretion. As we understand it, the denial of costs to the prevailing party or the assessment of partial costs against him is in the nature of a penalty for some defection on his part in the course of the litigation as, for example, by calling unnecessary witnesses, bringing in unnecessary issues or otherwise encumbering the record, or by delaying in raising objection fatal to the plaintiff's case. Highway Const. Co. v. City of Miami, 5 Cir., 126 F.2d 777; Royal Metal Mfg. Co. v. Art Metal Works, 2 Cir., 130 F. 778; Harland v. Bankers' & Merchants' Tel. Co., C.C., 32 F. 305; In re Swartz, 7 Cir., 130 F.2d 229; Commentary, 5 F.R.S. 54d. 143. A party, although prevailing, would be denied costs for needlessly bringing or prolonging litigation.

In our case, the master's only criticism was that defendant should have incorporated a three-word provision in its contract, thereby avoiding the necessity of reviewing twenty years of business dealings to establish its defense. However, there appears to be no indication of any bad faith or deliberate confusion on defendant's part, hence, we are of the opinion that, in the absence of some showing of bad faith or the deliberate adoption of a course of business dealings calculated to render litigation pertaining thereto unnecessarily prolix and expensive, the penalty of denial or apportionment of costs under Rule 54(d) should be imposed only for acts or omissions on the part of the prevailing party in the actual course of the litigation, except that where it is clear that the action was brought in good faith, involving issues as to which the law is in doubt, the court may in its discretion require each party to bear its own costs although the decision is adverse to plaintiff. See Bliss v. Anaconda Copper Mining Co., C.C., 167 F. 1024, 1028. In our case, since the judgment was not for each party to bear its own costs, but rather to pay half of the fees and charges of the master, and since that judgment in fact amounted to a penalty on defendant for prolongation of the litigation, the judgment was erroneous.

The judgment of the District Court in No. 9158 is affirmed, and that part of the judgment involved in No. 9159 taxing to defendant one-half of the costs of the proceedings before the master is reversed.