459 F.2d 926
 UNION INDUSTRIELLE ET MARITIME, Counter-Plaintiff-Appellant,
v.
NIMPEX INTERNATIONAL, INC., Counter-Defendant-Appellee.
UNION INDUSTRIELLE ET MARITIME, Counter-Plaintiff-Appellee,
v.
NIMPEX INTERNATIONAL, INC., Counter-Defendant-Cross-Appellant.
 Nos. 71-1097, 71-1098.
 United States Court of Appeals,
Seventh Circuit.
 April 21, 1972.
 
 Bennet B. Harvey, Jr., Robert A. Creamer, Chicago, Ill., David I. Gilchrist, New York City, for Union Industrielle et Maritime; Hill, Betts & Nash, New York City, Price, Cushman, Keck & Mahin, Chicago, Ill., of counsel.
 Hervey C. Allen, New York City, Warren A. Jackman, Chicago, Ill., for Nimpex International; Burlingham, Underwood, Wright, White & Lord, New York City, Bradley, Eaton, Jackman & McGovern, Chicago, Ill., of counsel.
 Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and GORDON, District Judge.*
 KNOCH, Senior Circuit Judge.
 
 
 1
 Counter-Plaintiff-Appellant and Appellee, Union Industrielle Et Maritime, the owner of the vessel JEAN SCHNEIDER, entered into a time charter of its vessel, dated August 23, 1966, with Midland Overseas Shipping Company, for one Great Lakes round voyage from the Continent. The charter provided for time charter hire in semi-monthly installments, payable in advance.
 
 
 2
 On September 13, 1966, Midland subchartered the vessel to the Counter-Defendant-Appellee and Cross Appellant, Nimpex International, Inc., for a voyage from Emden, Germany, to Cleveland, Toledo, Detroit, and Chicago. The voyage charter-party provided for full payment of all freight due by Nimpex to Midland within three working days after signing of the bills of lading.
 
 
 3
 On October 12, 1966, Midland paid Union the first semi-monthly installment of hire. On October 15, 1966, loading was completed at Emden, the bills of lading signed, and the vessel sailed.
 
 
 4
 On October 17, 1966, Nimpex paid Midland the sum due on the freight. Included in the sum paid was the cost of seaway tolls which Midland would in due course have to pay to seaway authorities. Midland never paid these tolls. Union paid them in the amount of $12,579.67, without prejudice to its rights against any of the parties or any liens on cargo, freight or sub-freights.
 
 
 5
 On October 27, 1966, Midland tendered a check for its second semi-monthly installment of the time charter hire. On October 29, 1966, Union's New York agent learned that the check would not be honored because of insufficient funds on deposit with Midland's bank. Subsequently, involuntary bankruptcy proceedings were filed against Midland, which were converted into Chapter XI proceedings, Case No. 67 B 1139, which were still pending when this cause was decided in the District Court.
 
 
 6
 On October 31, 1966, having learned that bills of lading for the cargo aboard the JEAN SCHNEIDER named Nimpex as the "notify" party, a Union representative communicated to Nimpex an assertion of owner's lien on goods and sub-freight and demanded payment of the hire then due in the amount of $37,204.15, which Nimpex refused on the ground it had already paid Midland without having had any notice from Union. Nimpex also refused Union's suggestion that the funds be placed in escrow or bond posted pending determination of the issue between the parties.
 
 
 7
 Union also asserts that sub-freights were created by Nimpex, payment for which, according to Union, was received after notice of Midland's default.
 
 
 8
 Union thereafter allowed the JEAN SCHNEIDER to proceed to Cleveland, Toledo and Detroit and to discharge cargo there pursuant to Nimpex's instructions.
 
 
 9
 By letter dated November 1, 1966, Nimpex had directed discharge of the Chicago-bound cargo at the Transoceanic Terminal facility there. Union replied that without an escrow agreement, or assurance that the Chicago-bound cargo would remain subject to Union's control, Union proposed to dispose of a sufficient portion of the cargo to reimburse Union for the freight and for expenses incurred in enforcing its asserted lien. When Nimpex rejected these proposals, Union directed its vessel to Rogers Terminal and began to discharge cargo there on November 10, 1966.
 
 
 10
 On November 9, 1966, Nimpex began action to recover the cargo and caused the arrest of the vessel. Union caused a bond in the amount of $500,000 to be posted, releasing the arrest and filed its counterclaim, asserting, inter alia, that under the terms of its time charter with Midland, it had reversed a lien on all cargoes and sub-freights.
 
 
 11
 Nimpex posted surety in the amount of $110,000 and obtained the release of the last of the Chicago cargo.
 
 
 12
 In discharging the cargo at Rogers Terminal, Union incurred a discharging expense of $17,412.02. Nimpex would have incurred a discharging expense of $13,929.63 had the cargo been delivered to Transoceanic Terminal as directed. Thus, Union asserts that it has directly saved Nimpex at least that sum for discharge of cargo. Only Nimpex's own parcel was detained after discharge, not another parcel for Associated Metals and Minerals Corporation, to which reference is made below.
 
 
 13
 The parties filed a complete stipulation of facts and other evidence referred to in their stipulation and briefs, including deposition testimony.
 
 
 14
 The parties are agreed that payment by a sub-charterer (here Nimpex) of the charter hire or freight to the time charterer (here Midland) without notice that hire or freight is owing to the vessel owner (here Union) from the intermediate charterer (Midland) protects the sub-charterer (Nimpex) from any requirement to make payment a second time to the owner (Union) because of the latter's lien.
 
 
 15
 It is further undisputed that on October 17, 1966, when Nimpex paid Midland, no hire was due from Midland to Union. The next payment was due October 27, 1966. At that time, Midland was also due to make payment for delivery bunkers which had originally been due on October 12, 1966, but which, the District Court found was deferred by mutual agreement to October 27, 1966. This finding is clearly supported by the documents in the record before us.
 
 
 16
 The provision for lien on cargo and sub-freight applies only where there is freight actually owing on shipment of goods. Gilmore and Black, The Law of Admiralty, 1957, p. 208.
 
 
 17
 In Jebsen v. A Cargo of Hemp, D.C., Mass., 1915, 228 F. 143, 148, the Court held that if freight had been paid in whole or in part in good faith to the charterer or sub-charterer without actual notice to the shipper of the claim of the libelant, the lien could be enforced only to the extent, which, if at all, the freight remained unpaid. In Jebsen, on which Union relies, the Court found that no part of the freight had been paid when notice was given that a balance was due and unpaid to the libelant owner for hire of the vessel, and freight was still due and unpaid when the owner sued in rem to enforce a lien.
 
 
 18
 Union, however, argues that Nimpex did not make its payment on October 17, 1966, in good faith because it knew or should have anticipated that Midland would default and that Union would acquire a lien.
 
 
 19
 As the District Judge found, had Nimpex made any inquiry on October 17, 1966, it would have learned that nothing was due and unpaid from Midland to Union, unlike the circumstances in The Solhaug, S.D., N.Y., 1931, 2 F. Supp. 294, 297, where the alleged payment was made after the charterer had been in default to the owner.
 
 
 20
 Union conjectures that had an inquiry been addressed to Midland on October 17th, an honest answer would have disclosed that Midland did not know how it was going to meet its coming payments, but Midland could also have stated honestly that it owed nothing on October 17th. Union considers that Nimpex should have been alerted to make inquiries from its past unsatisfactory dealings with Midland in 1965.
 
 
 21
 In 1965, a dispute had arisen concerning the terms of an agreement between Midland and Ben Friedman, President of Nimpex, which had nothing to do with financial responsibility but which had resulted in Midland's suing Nimpex and Nimpex's payment of an amount in settlement, and Mr. Friedman's subsequent personal unwillingness to do further business with Midland. However, Frantz Jacobsen, who had not been working for Nimpex in 1965, was booking vessels for Nimpex in 1966, and as he had been given a free hand, Mr. Friedman did not interfere when Mr. Jacobsen booked Midland chartered vessels.
 
 
 22
 In 1966 market reports showed Midland was getting rates above the going market, which were expected to result in good profits. Midland's president was very confident and said Midland was doing well. During 1966 Midland owed nothing to Nimpex. Midland in fact was expanding its business and enjoyed a substantial line of bank credit. We find no support for Union's view that these facts should have led to an inference that Midland was in an uncertain financial position.
 
 
 23
 Similarly we do not agree with Union that Nimpex should have expected default by Midland because of a report that Midland had assigned freights on one voyage charter early in 1966 (which Mr. Jacobsen said was a normal thing to do in the business of time chartering) or word that a small check had to be reissued because a Midland clerk had failed to get a necessary second signature on it, or even rumor (no date given and possibly after the voyage with which we are concerned) that another small check had "bounced" and been promptly made good.
 
 
 24
 Union particularly refers to subfreight on cargo shipped for Associated Metals amounting to $16,715.50. The bills of lading did not bear Nimpex's name and carried a different freight legend ("Freight Paid-Loaded under Deck") from that on the bills of lading for Nimpex's own parcel, to which we refer later.
 
 
 25
 In fact, all sub-freights were paid by Nimpex on October 17, 1966, as indicated. Nimpex itself received payment for that sub-freight when the seller paid its agent on October 18, 1966, thus relieving Nimpex of liability under the owner's subsequently acquired lien. Actieselskabet Dampsk Thorbjorn v. Harrison and Company, S.D., N.Y., 1918, 260 F. 287. Union argues that this payment was not actually received by Nimpex until its agent remitted the funds on December 16, 1966. To support this assertion, Union seems to assume that Hoesch Export acted for the German seller of the parcel to Associated, but the stipulated facts are that Hoesch "as agents for Nimpex" booked this parcel from the German seller at a freight which was paid by the German seller to Hoesch on October 18, 1966. The "freight" ceased to be freight to which a lien might have applied once it was paid to Nimpex's agent. Tagart, Beaton and Company v. James Fisher and Sons, 1903, 1 K.B. 391, 395, 72 L.J.K.B. 202, 204, 8 Commercial Cases 133, 136, cited with approval in In re North Atlantic and Gulf Steamship Company, S.D., N. Y., 1962, 204 F.Supp. 899, 904, aff'd. sub nom. Schilling v. A/S D/S Danneborg, 2 Cir., 1963, 320 F.2d 628.
 
 
 26
 The District Court found, and we agree, that certain other "subfreights" which Union contended were created by Nimpex, referred to steel which Nimpex contracted to sell at prices F.O.B. dock at destination. This was Nimpex's own parcel for which freight and custom duties were included in the purchase price. These contracts did not create sub-freights regardless of the fact that Nimpex took into account its freight costs in fixing prices. Payment by Nimpex to Midland before the lien arose, extinguished all claims by Union to any freights related to this cargo.
 
 
 27
 Union argues that the Master of the vessel was misled by a freight legend stamped on the bills of lading on Nimpex's own parcel which read "Freight and Seaway Tolls Payable at Destination." Nimpex suggests that perhaps this referred to place of payment rather than time of payment. However, aside from the fact that the Master could not, in any case, have converted freight prepaid pursuant to the voyage charter into collect freight, The Albert F. Paul, 2 Cir., 1924, 1 F.2d 16, 17, there was no evidence that anyone from Nimpex directed or authorized that language. Clause 29 of the voyage charter provided for employment of owner's (Midland's) agents. Midland appointed Schulte and Bruns and was joined in that appointment by Union. Schulte and Bruns furnished the bills of lading and it would be reasonable to deduce that they had placed the stamp on them.
 
 
 28
 Mr. Jacobsen said in his deposition that if Nimpex had had need to appoint an agent at Emden, Nimpex would have appointed Schulte and Bruns. That fact, of course, did not make them agents for Nimpex. Nor was there any basis for concluding that instructions had come on behalf of Nimpex via Hoesch Export as seller of the steel bought by Nimpex.
 
 
 29
 As to the seaway tolls mentioned above, Union's theory is that Nimpex, whose responsibility it was to pay these tolls, made Midland its agent to do so. But, as the District Judge found, there was no evidence to support an assertion that Midland was Nimpex's agent. The tolls were treated as part of the whole voyage freight which was pre-paid in one flat sum. Actieselskabet Dampsk Thorbjorn v. Harrison and Company, supra, 260 F. 287; American Steel Barge Company v. Chesapeake & Ohio Coal Agency Company, 1 Cir., 1902, 115 F. 669, 676. See also Marine Traders, Inc. v. Seasons Navigation Corporation, 2 Cir., 1970, 422 F.2d 804, 806.
 
 
 30
 The District Judge agreed with the general principle, asserted by Nimpex, that one who has a lien on goods and incurs expenses in keeping them to preserve his lien, may not claim those expenses from the owner of the goods, Carver, British Shipping Laws, Carriage by Sea (1971) Volume 2, 12th Edition, by Raoul Colinvaux, London, Stevens & Sons, p. 1158, Sec. 1367. Nevertheless, the District Judge found that Nimpex was benefitted to a certain extent by Union's discharge of the cargo and on the principle of basic equity, he directed payment to Union to the extent that Nimpex was actually benefitted or enriched. In all other respects Union's counterclaim was dismissed, a decision which Union has appealed. Nimpex has appealed from the order directing it to pay a part of these discharge costs and from denial of its costs in the litigation.
 
 
 31
 Nimpex points out that it stipulated its discharge costs at Transoceanic would have been $13,928.09, on a basis of $2.60 per long ton, but Union refused to accept that figure and the issue had therefore to be left for trial. At the hearing the only witness heard was Transoceanic's manager. The Court found the value of the service was $13,929.63, equivalent to $2.60 per long ton.
 
 
 32
 Nimpex also points out that it has been subjected to expense entailed in defending against Union's in rem counterclaim through four years of litigation, including premiums on the bond it was obliged to file to obtain release of its cargo.
 
 
 33
 We believe that in computing the value of the benefit resulting to Nimpex from discharge of its cargo, consideration should be given to its bond premiums.
 
 
 34
 As the prevailing party in the in rem claim for enforcement of lien, which was the substantial part of this litigation, Nimpex was entitled to its costs, absent a finding of some fault on its part, Chicago Sugar Company v. American Sugar Refining Company, 7 Cir., 1949, 176 F.2d 1, 11, or a determination that the action was brought in good faith involving issues on which the law was in doubt, where the Court might leave each party to bear its own costs. Bliss v. Anaconda Copper Mining, Circ. Ct., D.Montana, 1909, 167 F. 1024, 1028. Neither of these circumstances appears here.
 
 
 35
 For the sole purpose of recomputing the amount due Union from Nimpex, this cause is remanded to the District Court for further consideration in accordance with this opinion.
 
 
 36
 Affirmed in part; reversed in part and remanded with directions.
 
 
 
 *
 The Honorable Myron L. Gordon, United States District Judge for the Eastern District of Wisconsin, is sitting by designation